### UNITED STATES of America, Plaintiff–Appellee,

v.

### Michael J. KNOWLES, Daniel Wright, a/k/a William Hall, a/k/a Santa Claus, James Bruce Squires, a/k/a John West, Defendants–Appellants.

#### No. 91–4189.

United States Court of Appeals, Eleventh Circuit.

Oct. 17, 1995.

Arthur Johnson, Gainesville, FL, for M.J. Knowles.

Terry N. Silverman, Gainesville, FL, for Wright.

Edward L. Scott, Ocala, FL, for James Bruce Squires.

Charles Stansbury White, David L. McGee, Asst. U.S. Attorneys, Tallahassee, FL, for the U.S.

Before HATCHETT, Circuit Judge, CLARK, Senior Circuit Judge, and YOUNG *, Senior District Judge.

CLARK, Senior Circuit Judge:

In this large-scale drug conspiracy, co-defendants Michael Knowles, James Squires,

---

* Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

and Daniel Wright appeal their convictions and sentences on various grounds. For the reasons set forth below, we affirm all three defendants' convictions, but vacate the sentences and remand to the district court for resentencing under pre-Guidelines law.

## I. Background

### A. The nature of the conspiracy

This case arises out of a large scale conspiracy to import and distribute marijuana, cocaine, and hash oil. Michael Knowles, James Squires and Daniel Wright were indicted along with 23 others for various violations of Title 21 of the United States Code, including conspiracy to import, possess and distribute controlled substances, as well as numerous substantive violations.[1] These three individuals were tried together, and evidence at their trial established the following:

Beginning during the mid–1970s, a group of individuals including the brothers Kennie and Tico Rodriguez, Mario and Jimmy Controneo, and others formed agreements to obtain large amounts of controlled substances including marijuana and cocaine from various countries in and around the Caribbean to be distributed inside the United States and Canada. During the next several years, these individuals recruited boat captains and crew, airplane pilots, off-loaders and truck drivers to carry out the goals of the criminal organization. On many occasions, the organization used private vessels to import large loads of marijuana and other controlled substances.

At first, these vessels departed from and returned to one of several private ocean access waterfront homes in Southeastern Florida. The group soon established a second base of operations on the Western coast of Florida, including at least one ocean-access waterfront home in Ft. Myers, and another in Destin. Upon successful transport into one of these ports, the boats would be unloaded by crews who weighed the contraband

and loaded it onto transport vehicles equipped with hidden compartments for shipment to buyers in the Northeastern United States and Canada. The organization operated successfully and undetected by law enforcement for years. Overall, the group was responsible for the importation and distribution of approximately 100,000 pounds of marijuana, 10,000 pounds of cocaine, and several hundred pounds of hash oil.

In approximately 1984 or 1985, Tico Rodriguez recruited Daniel Hamm to captain vessels in several smuggling ventures. Initially, Hamm captained a boat known as the *Becky Ann*. According to the plan, Hamm, along with a crew consisting of Debbie Behmer and Mike Russell, were to take the boat from South Florida to the Bahamas, then to Jamaica where the boat would be loaded with drugs. From there the boat was to be taken to Cozumel, Mexico, and then to Destin, where the boat would be unloaded. Prior to the departure and pursuant to Tico's direction, Hamm and another individual matching the description of James Squires traveled to Destin to inspect the harbor and dock. Although the smuggling venture was completed without significant incident, the complaints about the boat voiced by the captain and crew caused Tico to arrange for a replacement. Tico arranged for Hamm to use Terry Fitzwater's boat, the *Suntimes*. With Hamm as captain, the *Suntimes* brought in four additional loads of approximately 2,500 to 3,000 pounds of marijuana into the Destin area.

Meanwhile, the *Becky Ann* was provided to James Squires and Daniel Wright, who had the boat transported to Ft. Myers by two of the group's smuggling captains, Bill Adams and John Rock. Wright assisted Adams and Rock in transporting the boat. According to Rock, John West, a/k/a James Squires, lived at the house in Ft. Myers to which the boat was transported.

---

**1.** Besides the three appellants, the other named defendants were: Herberto Julian Rodriguez ("Tico"), Jose Elias Sepulveda, Terence Alan Fitzwater, Richard Kenneth Kump, Michael Clinton Gruener, Christine Dickinson, Charles L. Davis, Teresa Boatwright Rodriguez, Kevin La-

cey, Susan Lacey, Joseph Dina, Rick Man Warren, Archibald Percival Jones, William Sipprell, Phillip Brundage, Timothy Brundage, Mark Newman, Mark Carter, Victor Negron, and Randall Wilson.

Meanwhile, Kennie Rodriguez arranged for the purchase of another sailboat, the *Freeflight*. This boat too was outfitted with hidden compartments with a capacity of approximately 3,000 pounds for smuggling drugs. Thereafter, Rodriguez and Fitzwater ran several successful smuggling loads on *Freeflight*.

The Rodriguez brothers also procured another vessel, a large motor boat named the *Olives*. This was a 52–foot cabin cruiser with a single hidden compartment capable of concealing 6,000 to 8,000 pounds of contraband. Archie Jones and Wolfgang Petrasko were recruited to captain several loads of controlled substances on the *Olives*.

In May, 1986, Jones captained one of his two smuggling ventures aboard the *Olives*. Jones took the vessel first to Puerto Rico, and then to Jamaica where it picked up approximately 7,000 to 8,000 pounds of marijuana, which was ultimately off-loaded in Ft. Myers. Jones later purchased the *Olives* and, during late 1987, returned the *Olives* to South Florida with a load of approximately 600 pounds of cocaine.

The group suffered a significant setback in early 1987 when three of the group's sailboats embarked on smuggling ventures at approximately the same time. These vessels were the *Freeflight*, *Mad Dog II*, and the *Suntimes*. Each of these boats traveled from Florida to Jamaica, where they were loaded with several thousand pounds of marijuana, without incident. However, in January 1987, during a stop-over in the Cayman Islands on its way back to the United States, *Mad Dog II* was seized and its crew arrested by Cayman law enforcement officers for carrying marijuana. The captain and crew, Michael Russell, Daniel Fedorka, and Debbie Behmer, cooperated and, as a result, the other two boats were targeted and eventually seized as well.

B.  The case against Knowles

Michael Knowles' involvement in charged criminal activity began in early 1987, immediately after the seizure of the *Suntimes* in Destin. The *Suntimes* had traveled to Jamaica, where it was loaded with marijuana. After learning of the seizure of the *Mad Dog II*, the *Suntimes* traveled to Cozumel, Mexico, to make it appear that the voyage was simply a tourist venture. The captain of the *Suntimes*, Charles Davis, aware of the plight of the *Mad Dog II*, did not want to continue the trip to Florida. He convinced Fitzwater to arrange for a replacement crew to bring the *Suntimes* back to the United States.

Fitzwater recruited Hamm to travel to Cozumel, and captain the *Suntimes*. He also recruited Mike Sudar to act as crew for the trip. Fitzwater promised Hamm $150,000, twice the usual price for an entire smuggling voyage. Hamm and Fitzwater also agreed that if there was trouble, Knowles, a lawyer in Miami, would be contacted.

Thereafter, Hamm and Sudar traveled to Cozumel, replaced the crew and took the *Suntimes* back to Destin. Upon arrival on February 3, 1987, the *Suntimes* was seized and the crew arrested by federal law enforcement agents. Learning of these developments, Fitzwater, who had traveled to Destin to await the arrival of the *Suntimes*, made arrangements for local lawyers to represent Hamm and Sudar. Hamm himself contacted his girlfriend, Lu Johnson, who contacted Michael Knowles. Knowles then contacted Fitzwater and asked for money to represent Hamm. Knowles traveled to Pensacola to assist in the representation of Hamm at his detention hearing.

Following the hearing, Hamm told Knowles about Terry Fitzwater (whom Hamm knew as Terry Alexander), and their involvement together in the drug smuggling business. Hamm also advised Knowles about the $150,000 he was owed by Fitzwater for the trip from Cozumel to Destin; Hamm asked Knowles to get the money for him.

Hamm also spoke with a Pensacola lawyer, Leo Thomas, whom Fitzwater had initially hired to assist in Hamm's representation. According to Thomas, he was hired by "Bob Smith" (an alias used by Terry Fitzwater) to represent Hamm. After taking a check for $37,500 to pay for his representation, Thomas met with Hamm and interviewed him at length. Thomas discovered that Hamm had not only knowingly committed the acts for which he was originally charged stemming

from the arrest and seizure of the *Suntimes,* but that he was also knowingly involved in a much larger conspiracy to import and distribute controlled substances. Specifically, Hamm told Thomas that he had captained four other smuggling loads for the Rodriguez brothers. Thomas met with Knowles following his debriefing of Hamm and shared all the information with Knowles.

Meanwhile, Knowles arranged to meet with Fitzwater to make arrangements to receive Hamm's payment of $150,000 for delivering the drug-laden vessel. Within two or three days, Knowles met with Fitzwater and his girlfriend, Kristine Osterman. According to Fitzwater, the purpose of the meeting was to discuss Hamm's situation and his expectation of payment of $150,000. Fitzwater and Knowles agreed that Knowles would be paid a fee of $38,000 for representing Hamm. The day following this meeting, Fitzwater delivered $185,000 in cash to Knowles, $150,-000 for Hamm and $35,000 for Knowles. (Fitzwater did not explain at trial why he paid Knowles only $35,000, rather than the $38,000 to which he had earlier agreed.)

Within three weeks after Hamm's arrest, authorities dismissed the charges against him in order to keep the broader investigation of the organization from being disclosed through pretrial discovery procedures. After he was released, Hamm went to see Knowles about the money he was owed by Fitzwater. Knowles gave Hamm $2,500 and told him to "lay low." He also encouraged him to get out of town—to get away from Miami and boats. Knowles assured Hamm that he would be in touch with Fitzwater to arrange for the $150,000 payment. Knowles told Hamm not to return home and arranged for him to stay in the Omni Hotel overnight.

Thereafter, Hamm left for Las Vegas, Nevada. Hamm testified that it was his idea to go to Las Vegas, and that Knowles had not given him any specific instructions other than to lay low. Approximately one week later, Knowles flew to meet with Hamm in Las Vegas, and gave him $50,000 in cash. Hamm gave $10,000 back to Knowles to cover Knowles' expenses and to pay Knowles to prepare a will for Hamm. Knowles then returned to Miami. During the next several weeks, Hamm phoned Knowles in Miami to inquire about the rest of his money. In response, Knowles wired several payments of several thousand dollars each. When sending the money, Knowles made sure that the money was not sent in Hamm's name. Instead, he wired the money to several women who agreed to pick the money up for Hamm. Additionally, Knowles wired $12,000 directly to a recreational vehicle dealer for the purchase of an RV for Hamm's use. Notwithstanding these series of payments, Hamm only received approximately $100,000 of the total $150,000 he was owed by the organization.

During the government's investigation of the conspiracy, Knowles met with Kennie Rodriguez, Terry Fitzwater, and other high-ranking members of the organization to apprise them of Hamm's status and unavailability as a potential witness. At the grand jury proceedings, Knowles acknowledged that he had received approximately $30,000 from a stranger in a Denny's parking lot. Although Knowles admitted receiving this cash, he failed to comply with reporting requirements that require a lawyer to report any receipt of cash in excess of $10,000.

C.    The case against Squires and Wright

Squires, a former Miami police officer, operated one of the organization's smuggling boats—the *Becky Ann.* Squires assisted the group during its first use of this boat smuggling marijuana into Destin. According to John Miller, Squires replaced Miller as Tico Rodriguez's "right-hand man" for at least two loads brought into Destin during 1984–85 to allow Miller to take a break from smuggling because of a drug use problem.

After this initial venture, the *Becky Ann* was given to Squires and one of his partners, another former Miami police officer—Danny Wright. Squires and Wright took the vessel to Ft. Myers, where they established and operated another off-load organization. At a house in Ft. Myers, Squires and Wright allowed the Rodriguez brothers and Controneo to off-load several of the group's other boats, including the *Olives, Cachausa* and the *Sunflower.*

During their active involvement in Ft. Myers, Squires and Wright made three separate attempts to run smuggling ventures with the *Becky Ann.* On the first attempt, they recruited John Rock and Hali McLaughlin to make a run to Belize. Rock brought the boat back with only a partial load—approximately 380 pounds of marijuana. Following the trip, Rock quit working for Squires and Wright because he did not like the boat. Squires and Wright thereafter recruited Williams Adams and Gary Powers to conduct two additional smuggling ventures, one on the *Becky Ann* and one on the *Sunflower.*

Additionally, several witnesses identified Squires as a reliable source of marijuana for Tico Rodriguez. Miller testified that Squires arranged for Rodriguez to receive approximately 1,000 pounds of marijuana stored in a warehouse located in South Florida between loads from the *Becky Ann.*

## II. Procedural History

On July 24, 1991, the grand jury returned a 41–count Fourth Superseding Indictment against the 23 defendants. Knowles, Wright, and Squires were charged in Counts 2 and 3 with conspiracy to import and distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 963. Additionally, Knowles was charged under Counts 39 and 40 with obstruction of justice and accessory after the fact, in violation of 18 U.S.C. §§ 1510 and 3 respectively.

Initially, Knowles, Squires, Wright, and co-defendants Fitzwater and Newman were to be tried together. Fitzwater and Newman, however, entered guilty pleas at the last minute. Thereafter, a seven-day trial began on September 17, 1991. Knowles represented himself at trial *pro se.* All three defendants were found guilty of the conspiracy charges, but Knowles was acquitted of the two substantive violations. Knowles was sentenced to 324 months' imprisonment, and Wright and Squires were each sentenced to 262 months' imprisonment.

### A. *Sufficiency of the evidence*

■ Knowles contends that the conspiracy to import and distribute drugs terminated with the seizure of the *Suntimes* on February 3, 1987, which was before he became involved in charged criminal activity. He argues that there is no evidence of any smuggling activity after the seizure, that the members of the conspiracy who were not caught fled South Florida, and that if anything, the evidence shows nothing more than that he was involved in the attempted cover-up of the conspiracy, as opposed to his participation as a member of the conspiracy. Since he was not charged in any conspiracy other than to import and distribute drugs, he contends, the evidence was insufficient to sustain his convictions on the conspiracy charges.

■ We review the sufficiency of the evidence *de novo,* viewing the evidence and all reasonable inferences derived therefrom in the light most favorable to the government.[2] For sufficiency purposes, the evidence "need not exclude every reasonable hypothesis of innocence;"[3] rather, the question is "whether a reasonable trier of fact, when choosing among reasonable constructions of the evidence, could have found the defendant guilty beyond a reasonable doubt."[4] This standard of review applies in assessing the sufficiency of "any criminal conviction, including one for conspiracy."[5]

■ The essential element of a drug conspiracy is an agreement by two or more

2. *United States v. Ramsdale,* 61 F.3d 825, 828 (11th Cir.1995) (citing *United States v. Muscatell,* 42 F.3d 627, 632 (11th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 2617, 132 L.Ed.2d 859 (1995)).

3. *United States v. Perez–Tosta,* 36 F.3d 1552, 1556–57 (11th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995) (quoting *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (*en banc*), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)).

4. *Ramsdale,* 61 F.3d at 829 (quoting *United States v. Cannon,* 41 F.3d 1462, 1466 (11th Cir. 1995) *cert. denied,* — U.S. —, 116 S.Ct. 86, — L.Ed.2d — (1995)).

5. *United States v. Spradlen,* 662 F.2d 724, 727 (11th Cir.1981) (citing *United States v. Malatesta,* 590 F.2d 1379, 1382 (11th Cir.) (*en banc*), *cert. denied sub nom. Bertolotti v. United States,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777)).

persons to violate the narcotics laws.[6] Participation in such an agreement need not be proven by direct evidence—"a common purpose and plan may be inferred from a 'development and collocation of circumstances.'"[7] In other words, the existence of a conspiracy may, and often is, be proved by circumstantial evidence, such as "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme."[8] Where, as here, the government's case is predicated largely, if not solely, on circumstantial evidence, "*reasonable* inferences, and not mere speculation, must support the jury's verdict."[9] An individual cannot escape guilt merely because he joined the conspiracy after its inception or because he played a minor role in the total scheme.[10] Knowledge of a conspiracy's "essential features and broad scope, though not of its exact limits," is sufficient evidence to convict one of a single conspiracy.[11] A conspiracy's duration is difficult to prove precisely, but generally continues until its purposes have either been abandoned or accomplished.[12]

The question of Knowles' involvement in the conspiracy is somewhat unique. It is undisputed that Knowles played no overt role whatsoever in the actual importation or distribution of controlled substances. There is no evidence that he bought or sold drugs, traveled on the smuggling boats, or helped unload or deliver narcotics. His only link to the conspiracy was his representation of Hamm. The critical inquiry, then, is whether it was reasonable for the jury to conclude that the actions Knowles took in connection with this representation were "in furtherance of" the conspiracy.[13] Knowles' contention is that this was an unreasonable inference for the jury to draw. He argues that the evidence points, rather, to nothing more than an attempt to conceal the conspiracy.

The Supreme Court has unambiguously held that acts of concealment are not part of the original conspiracy.[14] A conspiracy ends after "the central purposes of a conspiracy have been attained."[15] Concealment of the enterprise "indicate[s] nothing more than that the conspirators do not wish to be apprehended—a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord."[16] Thus, if Knowles' actions lead to no more

---

6. 21 U.S.C. § 846; *United States v. Tamargo*, 672 F.2d 887, 889 (11th Cir.), *cert. denied*, 459 U.S. 864, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982) (citing *Spradlen*, 662 F.2d at 727).

7. *Ramsdale*, 61 F.3d at 829 (citing *Perez–Tosta*, 36 F.3d at 1557 (quoting *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942))).

8. *Tamargo*, 672 F.2d at 889 (citing *Spradlen*, 662 F.2d at 727).

9. *Perez–Tosta*, 36 F.3d at 1557 (citing *United States v. Villegas*, 911 F.2d 623, 628 (11th Cir. 1990), *cert. denied*, 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991) (emphasis added)).

10. *United States v. Barnes*, 681 F.2d 717, 723 (11th Cir.), *opinion amended in part on other grounds*, 694 F.2d 233 (11th Cir.1982), *cert. denied sub nom. Riddle v. United States*, 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 802 (1983).

11. *Blumenthal v. United States*, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947).

12. *United States v. Aquafredda*, 834 F.2d 915, 919 (11th Cir.1987), *cert. denied sub nom. Agostino v. United States*, 485 U.S. 980, 108 S.Ct. 1278, 99 L.Ed.2d 489 (1988) (citing *United States v. Coia*, 719 F.2d 1120, 1124 (11th Cir.1983), *cert. denied*, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984)).

13. *See Pinkerton v. United States*, 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946) ("A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement."). As Learned Hand put it, a conspirator "must promote [the] venture itself, make it his own, have a stake in the outcome." *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.), *aff'd*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

14. *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

15. *Id.*, 353 U.S. at 401–02, 77 S.Ct. at 972.

16. *Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117–18 (D.C.Cir.1991), *cert. denied*, 502 U.S. 822, 112 S.Ct. 85, 116 L.Ed.2d 57 (1991) (citing *Grunewald*).

than an inference that he was attempting to conceal the conspiracy, we would be compelled to reverse the conviction.[17]

Because of the peculiarity of the facts of this case, we have found little guidance in the case law. Two cases provide some direction. In *United States v. Walker*,[18] the defendant, who was convicted for conspiring to defraud the government, argued that the indictment was time-barred, contending that the conspiracy ended when the Forest Service awarded him two contracts for logging in reliance upon false representations in bids he submitted. The defendant asserted that the acts relied upon by the government to prolong the conspiracy, performance of his contract with co-conspirators and division of the spoils, are analogous to acts of concealment. The Ninth Circuit disagreed, finding that "the acts of contract performance and division of profits ... formed part of the conspiracy because they did not *follow* the accomplishment of its central criminal objectives but rather were acts in *furtherance* of those aims, viz, obtaining and dividing the excess profits made on the timber." [19]

Similarly, in *United States v. Davis*,[20] the Tenth Circuit explicitly stated that the distribution of the proceeds of a conspiracy is an act occurring during the pendency of the conspiracy. Knowles argues that *Davis* is inapposite because there was no evidence that the $150,000 given to Knowles by Fitz-

water constituted proceeds of the conspiracy. This misses the point. The question is not whether the money was *derived* from drug sales, i.e., that it is "proceeds." Rather, the money being paid to Hamm represents *his* proceeds.[21] While the smuggling boats may have all been captured, and the members of the conspiracy dispersed to the four corners of the earth,[22] Knowles' payment of money owed to Hamm for smuggling a load of marijuana from Cozumel to Destin constitutes an act occurring during the pendency of the conspiracy.

In addition to the actual payment of money to Hamm, there was circumstantial evidence from which the jury could reasonably conclude that Knowles was aware of the scope and general plan of the conspiracy, participated in it, and profited from it. First, Knowles met with high-ranking members of the conspiracy. Although association alone is insufficient to prove participation, "[p]roof of association with the conspirators is one factor that can be considered as evidence of a defendant's participation in a conspiracy." [23] Second, Knowles received $185,000 *in cash* from Fitzwater. As the Fifth Circuit recognized in *United States v. Gallo*,[24] a defendant's knowing possession of a large sum of money may be considered evidence that the defendant knew the object of the conspiracy:

Drug traffickers are unlikely to entrust a large portion of the proceeds from their

---

**17.** Cf. *United States v. Green*, 594 F.2d 1227, 1229 (9th Cir.), *cert. denied*, 444 U.S. 853, 100 S.Ct. 108, 62 L.Ed.2d 70 (1979) ("If the principle objects of a conspiracy have been accomplished before an act of concealment, however, then in all but the unusual case the conspiracy has ended before the cover-up begins, and one who conceals the completed crime is not by that act guilty of conspiracy to commit the substantive offense.").

**18.** 653 F.2d 1343 (9th Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982).

**19.** *Id.* at 1348.

**20.** 766 F.2d 1452, 1458 (10th Cir.), *cert. denied*, 474 U.S. 908, 106 S.Ct. 239, 88 L.Ed.2d 240 (1985).

**21.** Different members of a drug conspiracy make money in different ways. Those who manufacture the contraband are paid by wholesalers,

wholesalers are paid by retailers, retailers sell the drugs on the street, etc. A necessary element to the conspiracy is the successful importation of the contraband, which requires individuals such as Hamm to be paid to pilot boat loads into the country.

**22.** The record indicates that after the Suntimes was seized, Kevin Lacey went to Canada, while Tico Rodriguez, and Mario and Jimmy Controneo went to Europe. Terry Fitzwater was finally apprehended after four years on the run in Idaho.

**23.** *United States v. Thomas*, 8 F.3d 1552, 1556 (11th Cir.1993) (citing *United States v. Garate–Vergara*, 942 F.2d 1543, 1547 (11th Cir.1991), *cert. denied sub nom. Contreras v. United States*, 502 U.S. 1110, 112 S.Ct. 1212, 117 L.Ed.2d 451 (1992), and *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983)).

**24.** 927 F.2d 815, 821 (5th Cir.1991).

illicit trade to an outsider, especially when the outsider is aware of the valuable nature of the merchandise that he is transporting.[25]

Third, Knowles profited in two ways from his association with the conspiracy: first, he received the $35,000 fee for representing Hamm and,, second, he .kept $50,000 of the $150,000 that he was supposed to turn over to Hamm. Had Knowles merely been paid an attorney's fee, his case would be a closer one; nevertheless, he did receive his attorney's fee in cash, which facilitated the conspiracy by permitting its operators to function without leaving a paper trial.

■■■ This case stands in marked contrast to those cases in which we have reversed conspiracy convictions based on insufficient evidence. For example, in *Ah Ming Cheng v. United States*[26], the defendant was convicted for conspiracy to import opium. The evidence showed that the defendant knew one of the conspirators (who pled guilty), that he met with him and a female companion, and that he met with and talked to some members of the ship's crew (who also pled guilty).[27] "But there was no proof, circumstantial or otherwise, that appellant knew that [a co-conspirator] had a large amount of currency with him, or that he was engaged in the narcotic business, or that he was dealing with members of the ship's crew in connection with the importation of narcotics."[28] We affirm Knowles' conviction for the same reasons that we reversed Cheng's. The variance in our holdings illustrates that an "inference of participation from presence and association with conspirators alone does not suffice to convict[,]" but that "such an inference is permissible in evaluating the totality of the circumstances."[29]

Viewing the circumstances in the light most favorable to the government, and drawing all reasonable inferences in their favor, we hold that there was sufficient evidence from which the jury could find that Knowles was guilty of conspiracy to import and distribute controlled substances.

B. *Jury instruction regarding termination of the conspiracy*

■■■ Knowles argues that the district court erred by not instructing the jury on whether the conspiracy had terminated before he became involved. He acknowledges that he did not request such an instruction at trial, and, therefore, we review the issue for plain error.[30] Under that standard, there must be error, the error must be plain, and the error must affect substantial rights.[31] "If these three prongs are met, we then have the discretion to correct the error, and we should do so if the error 'seriously effect[s] the fairness, integrity, or public reputation of judicial proceedings.'"[32] As is discussed above, the evidence was sufficient for the jury to reasonably conclude that Knowles' activities occurred during the pendency of the conspiracy. The district court's failure to *sua sponte* instruct the jury on the possible termination of the conspiracy was not plain error.

C. *Introduction of evidence of Knowles' failure to comply with reporting requirements*

■■■ Knowles argues that the court erred in permitting the government to introduce evidence that he received more than $10,000 in cash and failed to report it, as required under federal law. As he was not charged with a violation for this failure, he asserts that this was impermissible "other crimes" evidence, which should have been excluded under Fed.R.Evid. 404(b).

25. *Id.*

26. 300 F.2d 202 (5th Cir.1962).

27. *Id.* at 203–04.

28. *Id.* at 204.

29. *Perez–Tosta*, 36 F.3d at 1557 (citing *Bell*, 833 F.2d at 275).

30. Fed.R.Crim.P. 52(b); *United States v. Vazquez,* 53 F.3d 1216, 1221 (11th Cir.1995) (citing *United States v. Miller,* 22 F.3d 1075, 1079 (11th Cir. 1994)).

31. *United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).

32. *Vazquez,* 53 F.3d at 1221 (quoting *Olano,* —— U.S. at ——, 113 S.Ct. at 1776).

We will not disturb a trial court's decision to admit or exclude Rule 404(b) "other crimes" evidence absent a clear showing of abuse of discretion.[33] Rule 404(b) provides in relevant part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Nevertheless, this court has held that:

> Evidence of criminal activity other than the charged offense is not extrinsic under Rule 404(b) if it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense.[34]

Under this standard, we find that the district court did not abuse its discretion in admitting this evidence. Knowles' receipt of more than $10,000 cash was an integral part of his offense: it was evidence of an overt omission on his part, which was an integral and natural part of the circumstances surrounding the offenses for which Knowles was indicted. As such, it did not constitute impermissible "other crimes" evidence.

### D. *Motion for severance*

Defendants Squires and Wright argue that the district court erred by denying their motions for severance. During the course of the trial, both defendants moved several times to sever their trial from that of co-defendant Knowles, or, in the alternative, for mistrial. The defendants argue that severance was required for several reasons. First, the evidence did not demonstrate that their criminal acts and those of Knowles were intertwined. Second, they contend that Knowles was not even a part of the same conspiracy in which they participated. Third, they assert that Knowles presented a defense that was antagonistic to theirs, thereby compromising the fairness of their trial. Finally, appellants argue that Knowles' *pro se* representation was confusing and unfairly prejudicial.

This court is reluctant to reverse a district court's denial of severance, particularly in conspiracy cases, as generally "persons who are charged together should also be tried together."[35] The decision whether to grant a motion for severance "is committed to the sound discretion of the district court and can only be overturned for an abuse of discretion."[36] In considering a motion to sever, the district court must "balance the prejudice that a defendant may suffer from a joint trial, against the public's interest in judicial economy and efficiency."[37] In determining whether a defendant is prejudiced, the court must "consider whether the jury could 'individualize each defendant in his relation to the mass,' that is, whether the jury could avoid cumulating the evidence against all of the defendants and could make individualized guilt determinations."[38]

To demonstrate that the district court abused its discretion, a showing of

33. *United States v. Delgado*, 56 F.3d 1357, 1363 (11th Cir.1995) (citing *United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir.1992) (*en banc* )).

34. *Ramsdale*, 61 F.3d at 829 (quoting *United States v. Veltmann*, 6 F.3d 1483, 1498 (11th Cir. 1993)).

35. *United States v. Freyre–Lazaro*, 3 F.3d 1496, 1501 (11th Cir.1993), *cert. denied sub nom. Llerena–Acosta v. United States*, — U.S. —, 114 S.Ct. 1385, 128 L.Ed.2d 59 (1994) (quoting *United States v. Morales*, 868 F.2d 1562, 1571 (11th Cir.1989)); *also see United States v. Castillo–Valencia*, 917 F.2d 494, 498 (11th Cir.1990), *cert. denied sub nom. Pulido–Gomez v. United States*, 499, U.S. 925, 111 S.Ct. 1321, 113 L.Ed.2d 253

(1991) ("The general rule in this circuit is that defendants who are jointly indicted should be tried together, and this rule has been held to be particularly applicable to conspiracy cases.").

36. *United States v. Cross*, 928 F.2d 1030, 1037 (11th Cir.), *cert. denied*, 502 U.S. 985, 112 S.Ct. 594, 116 L.Ed.2d 618 (1991).

37. *Id.*

38. *United States v. Watchmaker*, 761 F.2d 1459, 1476 (11th Cir.1985), *cert. denied sub nom. Harrell v. United States*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986) (quoting *Kotteakos v. United States*, 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946)).

"compelling prejudice" is required.[39] "Compelling prejudice" exists where a defendant can demonstrate that without severance, he was unable to receive a fair trial, and the trial court could afford no protection from the prejudice suffered.[40] In short, this court will only grant relief if the appellant can show prejudice amounting to fundamental unfairness.[41]

After carefully reviewing the record, we conclude that the district court's failure to sever the trial of Squires and Wright from that of Knowles did not result in prejudice to any of the defendants. While Squires and Wright are correct that their acts were not intertwined with those of Knowles by a substantial identity of facts or participants, they have not shown that they were prejudiced by this. "A defendant does not suffer compelling prejudice sufficient to mandate a severance, simply because much of the evidence at trial is applicable only to co-defendants."[42] Here, significant portions of the trial were devoted to each of the defendants, and although Knowles' actions were distinct from those of Squires and Wright, it was not difficult for the jury to ferret out the details of each of the individual's criminal acts.

■■ Squires and Wright have also failed to show that Knowles was part of a separate conspiracy. "In determining whether a single conspiracy existed, we must ask, 'what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, then it is one conspiracy.'"[43] That there was no evidence that Squires and Wright even knew who Knowles was or associated with him at all during the course of the conspiracy does not connote the existence of more than one conspiracy. A conspirator need not know all of the members or details of a conspiracy to be held responsible as a co-conspirator.[44] The government need prove only the existence of a conspiracy and a participatory link with the defendant.[45] Indeed, we have already determined that Knowles was part of the conspiracy.

■■■ Nor is the argument that the defenses were mutually antagonistic availing. In order to compel severance, the defenses of co-defendants must be more than merely antagonistic, they "must be antagonistic to the point of being mutually exclusive."[46] Put another way, "[d]efenses can only be found to be antagonistic if "the jury, in order to believe the core of testimony offered on behalf of [one] defendant must necessarily disbelieve the testimony offered on behalf of his codefendant."[47] It is significant that Squires and Wright did not present any evidence in their defense.[48] This court has previously held:

> Where appellants presented no evidence amounting to a defense for the charges

**39.** *United States v. Starrett,* 55 F.3d 1525, 1553 (11th Cir.1995) (citing *Watchmaker,* 761 F.2d at 1476).

**40.** *Freyre–Lazaro,* 3 F.3d at 1501 (citations omitted).

**41.** *Smith v. Kelso,* 863 F.2d 1564, 1567–68 (11th Cir.), *cert. denied,* 490 U.S. 1072, 109 S.Ct. 2079, 104 L.Ed.2d 644 (1989).

**42.** *United States v. Smith,* 918 F.2d 1501, 1510 (11th Cir.1990), *cert. denied sub nom. Hicks v. United States,* 502 U.S. 849, 112 S.Ct. 151, 116 L.Ed.2d 117 (1991).

**43.** *United States v. Cole,* 755 F.2d 748, 764 (11th Cir.1985) (quoting *United States v. Perez,* 489 F.2d 51, 62 (5th Cir.1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 3068, 41 L.Ed.2d 664 (1974)); *also see United States v. LaFraugh,* 893 F.2d 314, 318 (11th Cir.), *cert. denied,* 496 U.S. 911, 110 S.Ct. 2601, 110 L.Ed.2d 281 (1990).

**44.** *United States v. Reed,* 980 F.2d 1568, 1582 (11th Cir.1993), *cert. denied sub nom. Lady v. United States,* —— U.S. ——, 113 S.Ct. 3063, 125 L.Ed.2d 745 (1993) (citing *Blumenthal,* 332 U.S. at 558, 68 S.Ct. at 257).

**45.** *Id.,* 980 F.2d at 1582–83; *also see Blumenthal,* 332 U.S. at 558, 68 S.Ct. at 257.

**46.** *Castillo–Valencia,* 917 F.2d at 498 (citing *United States v. Berkowitz,* 662 F.2d 1127, 1133 (5th Cir. Unit B 1981)).

**47.** *See United States v. Strollar,* 10 F.3d 1574, 1578 (11th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2688, 129 L.Ed.2d 820 (1994) (quoting *United States v. Esle,* 743 F.2d 1465, 1476 (11th Cir.1984) (*per curiam*)).

**48.** *Strollar,* 10 F.3d at 1578.

against them, prejudice cannot be found simply by virtue of the fact that the defense of their co-defendants further implicated the appellants' guilt.[49]

■ Finally, Knowles' decision to represent himself did not affect the fairness of the trial of Squires and Wright. The appellants note that in *United States v. Veteto*,[50] this court recognized that a trial involving both a *pro se* defendant and defendants with legal representation "is pregnant with the possibility of prejudice." The court referenced the Second Circuit case, *United States v. Sacco*,[51] and noted with approval the steps suggested by that court to prevent "the possibility of prejudice from ripening into actuality."[52] The steps enumerated by the Second Circuit included: (1) appointing standby counsel; (2) warning the *pro se* defendant that he will be held to the rules of law and evidence; (3) admonishing the defendant that he should refrain from speaking in the first person in his comments on the evidence; (4) instructing the jury prior to closing remarks, during summation, and in final instructions that nothing the lawyers said is evidence in the case; and (5) making it clear to the jury at the outset that anything the *pro se* defendant says in his "lawyer" role is not evidence.[53] Squires and Wright suggest that although most of these recommendations were followed in their trial, the failure to appoint standby counsel was reversible error. We do not agree. The utility of assigning stand-by counsel to *pro se* litigants is to assist them with the technical complexities inherent in the law and in trying a case. We think it significant that Knowles was himself a lawyer, unlike the *pro se* defendants in *Veteto* and *Sacco*, and therefore the need for standby counsel was obviated.

In any event, Squires and Wright suffered no compelling prejudice from a lack of severance because the evidence against them was more than sufficient to support their convictions.[54] Our review of the record reveals that it was not unreasonable for the jury to conclude that Squires and Wright were active participants in the conspiracy, and the jury was not hampered from reaching this conclusion by the joint trial.

### E. *Motion for continuance of jury selection*

■ As previously noted, Knowles, Squires, Wright, and co-defendants Fitzwater and Newman were originally to be tried together. On the morning jury selection was to begin, however, Fitzwater announced that he desired to enter a guilty plea, and the district court continued jury selection until the afternoon. Following Fitzwater's plea, Newman announced that he was considering entering a guilty plea but had not finalized his decision. Squires and Wright requested that the court again continue jury selection based on the possibility that Newman might enter a guilty plea. The district court denied the request and jury selection began that afternoon. Newman entered a guilty plea the following day. The court gave the appellants the opportunity to propose curative measures to explain Newman's absence to the jury. The appellants requested that the court not give any curative instruction, arguing that to do so would only draw more attention to Newman's absence. On appeal, the appellants contend that they were unduly prejudiced by Newman's sudden disappearance after jury selection had already begun, and that the court could have alleviated the problem by briefly delaying jury selection.

■ Whether to grant a continuance is a matter committed to the sound discretion of the trial court, and its decision will not be disturbed unless there is a clear showing of abuse of discretion.[55] "This issue must be

---

49. *Castillo–Valencia,* 917 F.2d at 499.

50. 701 F.2d 136, 139 (11th Cir.), *cert. denied sub nom., Wescott v. United States,* 463 U.S. 1212, 103 S.Ct. 3548, 77 L.Ed.2d 1396 (1983).

51. 563 F.2d 552 (2d Cir.1977), *cert. denied,* 434 U.S. 1039, 98 S.Ct. 779, 54 L.Ed.2d 789 (1978).

52. *Veteto,* 701 F.2d at 139.

53. *Sacco,* 563 F.2d at 556–57.

54. *See Smith v. Kelso,* 863 F.2d at 1571–72.

55. *United States v. Darby,* 744 F.2d 1508, 1521 (11th Cir.1984), *cert. denied sub nom. Yamanis v. United States,* 471 U.S. 1100, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985).

decided in light of the circumstances presented, focusing upon the reasons for the continuance offered to the trial court when the request was denied."[56]

At the time the appellants requested the continuance, the district court had no assurance that Newman would enter a guilty plea. When Newman did enter the plea, the appellants were offered the opportunity to propose a curative instruction, but declined. They have not demonstrated that they were prejudiced by the denial of the continuance. Under these circumstances, we think the decision not to grant a continuance based on the possibility that one defendant may enter a guilty plea was not an abuse of discretion.

### F. *Introduction of plea agreements into evidence*

Wright argues that the district court committed error when it permitted the government to introduce into evidence plea agreements of co-defendant witnesses. Wright asserts that, because these agreements contained promises to testify truthfully, they improperly and prejudicially vouched for the credibility of the witnesses. Wright also asserts that the government improperly vouched for the veracity of the co-defendant witnesses in its closing argument. Finally, Wright argues that it was impermissible for one government witness, Debbie Behmer, to testify that her plea agreement included a provision requiring her to take a polygraph test if asked. None of these arguments is persuasive.

"In general, statements contained in a plea agreement that require a witness to testify truthfully should not be used during direct examination and may be used on re-direct only if the credibility of the witness is attacked on cross examination."[57] When the defense attacks the witness's credibility in its opening statement, however, then the prosecutor is permitted to elicit testimony about the truth telling requirement on direct examination.[58] Wright's counsel attacked the credibility of the government's witnesses in his opening statement.[59] As such, counsel opened the door for the government to introduce the plea agreements on direct examination.

Nor did the government improperly bolster or vouch for its witnesses. The test for whether a witness has been improperly bolstered is "whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility."[60] As this court has stated, this test may be satisfied in two ways:

First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity. Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony.[61]

The government's closing argument did not violate either prong of this standard. The

**56.** *United States v. Garmany*, 762 F.2d 929, 936 (11th Cir.1985), *cert. denied*, 474 U.S. 1062, 106 S.Ct. 811, 88 L.Ed.2d 785 (1986).

**57.** *United States v. Cohen*, 888 F.2d 770 (11th Cir.1989) (citing *United States v. Cruz*, 805 F.2d 1464, 1480 (11th Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987), and *United States v. Hilton*, 772 F.2d 783, 787 (11th Cir.1985)).

**58.** *Cruz*, 805 F.2d at 1480 (citing *United States v. Smith*, 778 F.2d 925, 928 (2d Cir.1985)).

**59.** In the opening statement, Wright's counsel said: "you're going to hear from people that have plea bargains, and the Court asked you about plea bargains and how you felt about them, that is people who have made deals with

the government in exchange for their testimony; that is, they're being paid; they're being compensated in one manner or another; either they're saving their liberty; they're paying money; they're doing something in exchange for their testimony here in this trial ... Any testimony you hear about Danny Wright will be from those kinds of people; that their testimony, after you have heard this whole case, is not going to be believable." Supp.R1 at 18–19.

**60.** *United States v. Sims*, 719 F.2d 375, 377 (11th Cir.1983), *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984) (citing *United States v. Roberts*, 618 F.2d 530, 537 (9th Cir.1980), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981)).

**61.** *Sims*, 719 F.2d at 377 (citations omitted).

impermissible language complained of is the following:

> Now, do they ever tell the truth, and how do you know they are telling the truth? Well, yeah, first thing you do is make it so the truth helps them and lies hurt them. You give them a carrot stick, you get a break for the truth, and hurt for lying.... And I submit, ladies and gentlemen, that if you examine the testimony of the witnesses, you will find that it is worthy of belief, that it does comport with the other evidence.
>
> The government has this deal with them, and they are required to cooperate, and the cooperation [sic] is defined in the agreements, the cooperation and taking the stand and telling the truth.
>
> Now do we have a lot of control over them? Yeah, we put them—we put the squeeze on them, you better believe it is a big squeeze ... [62]

Before making these statements, however, the government urged caution in evaluating the testimony of co-defendant witnesses:

> "Let me talk about the government witnesses. You know, and this applies to the defendants' comments that a number of the witnesses are crooks; and, ladies and gentlemen, they are, but we have caught a lot of crooks, and you have seen a lot of them testify from this stand, and you have every right to use caution when you listen to a person like that. When you listen to a person who's gotten convicted, you ought to be cautious.".[63]

When read in context, it is clear that the government's comments did not improperly vouch for the witnesses. Rather, the government urged a cautious and detailed examination of the witnesses' testimony. We find no impropriety in the prosecutor's statement— he never issued a personal assurance regarding the witnesses' veracity.

Finally, Wright's argument regarding testimony about a polygraph examination is without merit because this testimony was elicited by Wright's counsel himself, not the government.[64] Accordingly, there was no error.

*G. Denial of motion for mistrial based on prosecutor's impermissible reference to Wright's failure to take the stand*

Wright contends that the court erred by failing to grant his motion for mistrial based on the government's allegedly impermissible comment on his decision to exercise his Fifth Amendment privilege against self-incrimination.[65] During rebuttal closing argument, the prosecutor said:

> And who's William Hall, ladies and gentlemen? Meet William Hall, Danny Wright. Start with that, and then put the six other witnesses on there. Listen to their stories. Does it fit? Does it make sense? Does it comport with your common sense? Why in the world is he living under a phony name? Did you ever hear an explanation for that?
>
> Mr. SILVERMAN: I'm going to object and move for a mistrial on that.
>
> THE COURT: It's denied.[66]

Wright argues that although this was not a direct reference to his failure to testify, it was an implied reference sufficient to meet the test for impropriety.

"The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify." [67] A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was *manifestly intended* to be a comment on the defendant's failure to testify; or (2) the statement "was of such a character that a jury would naturally and

---

**62.** 2nd Supp.R at 29–30.

**63.** 2nd Supp.R. at 28–29.

**64.** R5 at 188.

**65.** "No persons ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V.

**66.** 2nd Supp.R at 31.

**67.** *Muscatell,* 42 F.3d at 631 (citing *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965)).

necessarily take it to be a comment on the failure of the accused to testify."[68] "The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury *necessarily* would have done so."[69] "The defendant bears the burden of establishing the existence of one of the two criteria."[70] The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement.[71] Because the trial judge is the only person who has the opportunity to observe the prosecutor's demeanor firsthand, we review the district court's denial of the motion for mistrial for abuse of discretion.[72]

Under this standard, we find that the district court did not abuse its discretion in denying the motion for mistrial. The remark is not one that a jury would necessarily take to be a comment on Wright's failure to testify. Besides taking the stand in one's own defense, there are a variety of ways to explain the use of a phony name. As such, the remark is not so much a comment on Wright's failure to testify, but rather on Wright's *counsel's* failure to counter or explain the false name. "It is not error to comment on the failure of the defense as opposed to the defendant, to counter or explain the evidence."[73] Thus, we find no error.

### H.  *Sentencing*

Knowles and Squires contend that the court erred by applying the sentencing guidelines, when there was no evidence that the conspiracy continued past the guidelines'

effective date, November 1, 1987. The government offers two reasons why the guidelines should apply. First, there was testimony that drug importation continued at least until December, 1987. Second, this court has already upheld application of the Guidelines in this case in the sentencing of co-defendant Fitzwater.[74] Neither contention is persuasive.

The testimony relied upon by the government is that of Mark Govea. Govea was the "right-hand man" to Kennie Rodriguez, one of the leaders of the organization. During the course of his testimony, the government questioned Govea regarding houses that were used to off-load the contraband:

Q: Let's go back to the offload houses. You said there was one in Destin?

A: Yes. That was Kevin Lacey's house, his actual residence.

Q: His home?

A: Yes.

Q: You said there were two in Fort Myers.

A: Yeah.

Q: And there was—what other ones? You said three in the Miami/Fort Lauderdale area.

A: There was Duguay's house.

Q: Gilbert Duguay?

A: Yeah, which was at Lighthouse Point, *and later on we used—in 1987, Archie used* his home in Keystone Heights, which is in North Miami.

Q: Archie who?

68. *Baxter v. Thomas*, 45 F.3d 1501, 1508 (11th Cir.1995), *petition for cert. filed*, (Aug. 7, 1995) (No. 95–5541) (citing *United States v. Garcia*, 13 F.3d 1464, 1474 (11th Cir.), *cert. denied sub nom. Chaves v. United States*, —— U.S. ——, 114 S.Ct. 2723, 129 L.Ed.2d 847 (1994) (quoting *United States v. Swindall*, 971 F.2d 1531, 1551 (11th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 683, 126 L.Ed.2d 650 (1994))).

69. *Swindall*, 971 F.2d at 1552 (citations omitted) (emphasis in original).

70. *Muscatell*, 42 F.3d at 632 (citing *Garcia*, 13 F.3d at 1474).

71. *Muscatell*, 42 F.3d at 632; *also see Kennedy v. Dugger*, 933 F.2d 905, 915 (11th Cir.1991), *cert.*

*denied*, 502 U.S. 1066, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992).

72. *Muscatell*, 42 F.3d at 632 (citing *United States v. Watson*, 866 F.2d 381, 386 (11th Cir.1989)).

73. *United States v. Griggs*, 735 F.2d 1318, 1321 (11th Cir.1984); *also see Swindall*, 971 F.2d at 1551–52 (if neutral explanation exists for remark, then the court could reasonably have construed the prosecutor's remarks as not manifestly intended to comment on defendant's failure to testify).

74. *United States v. Fitzwater*, No. 92–2540, 1993 WL 185789 (11th Cir.1993) (*per curiam*) (unpublished).

A: Archie Jones.

Q: What was he bringing in there?

A: Cocaine.

Q: Okay. When was the last time that came in?

A: December '87, that was the second trip there.

Q: What boat was he using to do that on?

A: The OLIVES. *He had bought the OLIVES from Kennie and Jose.*[75]

We agree with the defendants that this testimony alone is insufficient to tie Archie Jones' venture in December 1987 to the charged conspiracy. Several factors are significant in this determination. First, Archie Jones bought the boat from Kenny Rodriguez and Jose Sepulveda and used Gilbert Duguay's house as an off-load house. This indicates that Jones was operating on his own—no evidence was ever submitted that it was standard for pilots working for the organization to buy the boats they used, and no evidence was submitted the Duguay's house was used for any other ventures by the organization. Second, Govea corrected himself, saying that "Archie" not "we" (i.e., the drug organization) used the house as an off-load house. Third, Jones smuggled in cocaine, and Govea had testified that although the Rodriguez organization at one time did smuggle cocaine, it had long ago switched exclusively to marijuana and hash oil.

■ The government's second reason is likewise unavailing. Fitzwater pled guilty, and thus was obliged to accept the dates as stated on the indictment. Fitzwater's counsel failed to argue that the conspiracy ended prior to November 1, 1987, arguing only that there was no evidence to tie Fitzwater to any events after that date. In the case of the defendants here, the dates were a contested trial issue. The government was required to prove that the conspiracy continued after November 1, 1987, and, as the only evidence provided was Govea's testimony, they failed to carry their burden. We therefore vacate

the defendants' sentences, and remand for resentencing pursuant to pre-Guidelines law.[76]

The defendants raise various other challenges to the application of the Guidelines to their sentences. In light of our decision, these issues are rendered moot.

### III. Conclusion

For the foregoing reasons, we AFFIRM the convictions of all three defendants; we VACATE the defendants' sentences, and REMAND for resentencing in accordance with pre-Guidelines law.

---

75. R8 at 48–49 (emphasis added).

76. Although defendant Wright has not raised this issue on appeal, because application of the

Guidelines was plain error, we vacate his sentence and remand for re-sentencing as well.