[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 21, 2007
THOMAS K. KAHN
CLERK

No. 06-14849
Non-Argument Calendar

_____

D. C. Docket No. 05-00071-CR-DHB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERTO ALEJANDRO FRANCISCO-GUTIERREZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(September 21, 2007)**

Before DUBINA, CARNES and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, Roberto Alejandro Francisco-Gutierrez appeals his

convictions for one count of assault, in violation of 18 U.S.C. § 113(a)(6), and

three counts of cruelty to a child, in violation of 18 U.S.C. §§ 7 and 13, and

O.C.G.A. § 16-5-70(a) and (b).  After review, we affirm.

## I.  BACKGROUND

Because Gutierrez challenges the sufficiency of the evidence, we first review

the evidence presented at trial.

### A.    Events of February 8 and 9, 2005

Gutierrez is married to Tiffany Hines, a soldier in the United States Army.

In February 2005, Gutierrez, Hines and their seven-month old daughter, C.G., lived

in military housing on Fort Gordon, a military base near Augusta, Georgia.

Gutierrez watched C.G. during the day while his wife was at work.

On February 8, 2005, Hines came home from work at lunchtime and noticed

that C.G. was quiet and not as active as she normally was.  C.G. also cried when

Hines picked her up.  Gutierrez told Hines that C.G. "was just sore."

The next morning Hines noticed that C.G.'s arm was swollen and had a

disagreement with Gutierrez over whether they should take C.G. to the hospital.

Gutierrez convinced Hines to wait to see if the swelling would subside.

During the day, Gutierrez asked a neighbor, Lee Anna Sayers, if she would

babysit C.G. for an hour while he helped another neighbor move.  Sayers agreed.

Before Gutierrez left, he told Sayers that C.G.'s arm was injured as a result of a

bug bite and that he had already taken C.G. to a doctor. Gutierrez advised Sayers to leave C.G. in her car seat and try not to touch the arm because it was irritated.

After Gutierrez left, Sayers noticed that the bottle Gutierrez had provided was dirty and that the formula inside it was "chunky" at the bottom as if it had been refilled without first being cleaned. Sayers emptied the bottle, cleaned it and filled it with fresh formula. In addition, C.G.'s car seat and blanket were dirty and smelled like old formula and "spit up."[1] When Sayers took C.G. out of the car seat, Sayers noticed that C.G.'s arm was swollen to more than twice the size of her other arm. C.G. became very upset when Sayers touched her elbow. Gutierrez returned for C.G. approximately four hours later.

That evening, Gutierrez and Hines brought C.G. to the emergency room at Eisenhower Army Medical Center at Fort Gordon. Dr. Ivey Shuman diagnosed C.G. with a fracture in her right arm above the elbow and referred her to an orthopedist. Gutierrez explained to Dr. Shuman that he had placed C.G. in a car seat on a couch and C.G. had fallen over. Gutierrez also offered this explanation to his wife for the first time. Dr. Shuman was concerned about C.G.'s injury because

---

[1]Two other neighbors, who had watched C.G. for Gutierrez on occasion, also testified at trial. These neighbors stated that when Gutierrez would drop C.G. off, he would often fail to provide any supplies such as a bottle or diapers. In addition, C.G. and her clothes were very dirty and smelled of sour milk. One neighbor described Gutierrez providing a bottle that had mold growing in the formula.

it was not consistent with a fall and suspected that the injury may have been the result of abuse.

Once C.G. was admitted to the hospital, she was examined by Dr. Jason Lanham, the chief resident for inpatient services. Gutierrez told Dr. Lanham that he had placed C.G. unrestrained in a car seat on a sofa about three feet off the ground. Gutierrez said that he left the room for a moment, heard C.G. crying and returned to find C.G. on the ground. When Dr. Lanham obtained C.G.'s history from her parents, they indicated that there had been no past injuries or illnesses. However, after reviewing x-rays, Dr. Lanham discovered a break in C.G.'s left clavicle that was healing, which meant that it did not occur at the same time as the break in C.G.'s right elbow. Gutierrez told Dr. Lanham that, on another occasion three weeks earlier, C.G. "was in a car seat unrestrained on the sofa and had fallen out of the car seat on to the floor." Dr. Lanham opined that C.G.'s injuries were the result of abuse rather than an accidental fall given the type and locations of the fractures and C.G.'s young age.

Dr. Thomas Gibson, the chief of pediatric orthopedic surgery, performed surgery to repair C.G.'s broken bone in her right arm. According to Dr. Gibson, the three fractures most highly suggestive of child abuse are fractures to the humerus, clavicle and ribs, all of which C.G. sustained. Dr. Gibson opined that

4

C.G.'s injuries were the result of abuse because they would not be caused by the fall described by Gutierrez.

Dr. Clarence Joe, a radiologist, reviewed C.G.'s x-rays. Dr. Joe noted a healing clavicle fracture, two rib fractures and two fractures in C.G.'s right arm. One of C.G.'s arm fractures, an oblique fracture of the proximal humerus, was the result of a twisting motion. The other arm fracture was a horizontal fracture of the distal humerus, which was caused by a direct blow. The rib fractures were more likely caused by pressing a finger into the rib rather than from a fall. Based on C.G.'s having suffered multiple fractures that were in different stages of healing, Dr. Joe opined that the injuries were an indication of child abuse.

**B.     Interviews on February 10 & 11, 2005**

On the evening of February 10, Sergeant Vanessa Kahn of the Fort Gordon Military Police ("MP") received a call from emergency room physicians reporting possible child abuse. Sergeant Kahn met Gutierrez and Hines at the hospital and then directed Gutierrez to meet her at the military police investigator's office.

At 1:30 a.m. that same evening, Sergeant Kahn advised Gutierrez of his <u>Miranda</u> rights, interviewed Gutierrez and then took his written statement. In his statement, Gutierrez averred that on February 8, he had placed C.G. in her car seat but forgot to place the safety restraint around her. Gutierrez placed the car seat on

5

the couch and then ran to the kitchen to turn off the stove. Gutierrez heard a crash, and C.G. began to cry. Gutierrez ran to the living room and found C.G. laying on the floor with her car seat on top of her. When Gutierrez picked C.G. up, she stopped crying and went to sleep.

The following afternoon, Gutierrez was interviewed by Agent Brian Wilhelm, an investigator with the Criminal Investigation Division ("CID") at Fort Gordon. After Agent Wilhelm advised Gutierrez of his Miranda rights, Gutierrez said that C.G. had fallen out of her car seat, off the couch, and onto the floor of their home. Gutierrez admitted that he sometimes got angry and yelled and that he had punched holes in the walls of his residence. Gutierrez stated that he got frustrated being a first-time father and "had some anger management problems." Gutierrez admitted turning music up loud so he would not hear C.G. cry.

Agent Wilhelm asked Gutierrez if he had mentioned C.G.'s arm injury to any neighbors, and Gutierrez said he had not. Agent Wilhelm then advised Gutierrez that he had already spoken with Sayers and that Gutierrez had told Sayers that C.G.'s arm was swollen from a bug bite. Gutierrez admitted that he had lied to Agent Wilhelm and then terminated the interview.

Another CID investigator, Edward Lee Harris, went to Gutierrez's residence on February 10 and took photographs of, among other things, the sofa from which

6

Gutierrez claimed C.G. had fallen. Harris estimated that the seat of the sofa was a little less than a foot off the ground. According to Harris, the residence was dirty and had a foul smell. Harris also observed a number of patched holes in a door and the walls and a damaged door frame.

Hospital staff also notified Jessica Carraballo, an investigator with the Department of Children and Family Services, who came to the hospital to conduct an investigation. Carraballo interviewed Gutierrez, who told Carraballo that C.G.'s arm was injured at home when she fell from her car seat, off the sofa and onto the floor. Gutierrez said that he picked C.G. up and held her until she stopped crying and that he had not noticed any injury at that time. Later that day, however, a neighbor who was caring for C.G. pointed out to Gutierrez that C.G. had a bruised arm. Gutierrez then waited for his wife to come home from work to take C.G. to the hospital.

## C.    Indictment and Trial

Gutierrez was indicted by a grand jury for: (1) assault on C.G. resulting in serious bodily injury, namely fracturing her right arm, in violation of 18 U.S.C. § 113(a)(6) (Count One); (2) willfully depriving C.G. of necessary sustenance to the extent that her well-being was jeopardized, in violation of 18 U.S.C. §§ 7 and 13 and O.C.G.A. § 16-5-70(a) (Count Two); (3) maliciously causing C.G.

7

excessive physical and mental pain by failing to seek immediate and necessary medical attention for injuries suffered to C.G.'s right arm (Count Three) and for injuries to C.G.'s ribs and clavicle (Count Four), in violation of 18 U.S.C. §§ 7 and 13 and O.C.G.A. § 16-5-70(b). Gutierrez pled not guilty. After a trial, the jury found Gutierrez guilty on all four counts.

Gutierrez filed a motion for a judgment of acquittal, arguing that the government had failed to prove that Gutierrez was responsible for C.G.'s injuries or that the offenses had occurred on land subject to federal jurisdiction, i.e., Fort Gordon. The district court denied the motion, concluding that the jury's verdict was supported by the evidence. Gutierrez filed a motion to arrest the judgment, arguing that the district court lacked jurisdiction over him because the government had failed to prove that the offenses occurred at Fort Gordon. The district court denied the motion.

The district court sentenced Gutierrez to 84 months' imprisonment. Gutierrez timely filed this appeal.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Gutierrez does not challenge the sufficiency of the evidence on the three counts of cruelty to a child. Instead, Gutierrez challenges the sufficiency of the

8

evidence only as to the assault count as to C.G.'s arm fractures.

To convict under 18 U.S.C. § 113, the government must establish that the individual "assaulted" another person in the territorial jurisdiction of the United States. 18 U.S.C. § 113(a); United States v. Williams, 197 F.3d 1091, 1096 (11th Cir. 1999). Gutierrez was charged with assault under § 113(a)(6), which provides that an "assault" that results in "serious bodily injury" is punished by "imprisonment for not more than ten years." 18 U.S.C. § 113(a)(6).[2] Section 113 does not define "assault," but this Court has given the term its common law meaning. Williams, 197 F.3d at 1096. Further, we have concluded that an "assault" within the meaning of § 113 includes a common law battery defined as a willful, offensive touching, regardless of the intent to do physical harm. Id.

Here, we first conclude that there is ample evidence to support Gutierrez's assault conviction. Gutierrez not only was taking care of C.G. immediately before his wife discovered the baby's swollen arm, but was reluctant to take C.G. to the

---

[2]Section 113(a)(6) states:

(a) Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:
....
(6) Assault resulting in serious bodily injury, by a fine under this title or imprisonment for not more than ten years, or both.

18 U.S.C. § 113(a)(6).

9

hospital.  Gutierrez did not dispute that C.G. had the charged broken arm, but gave different explanations for the injury before and during the investigation. Specifically, Gutierrez told his wife that C.G. was merely sore, told his neighbor that C.G. had suffered a bug bite and told doctors and investigators that C.G. had fallen out of the car seat on the couch and onto the floor.  Expert testimony by doctors indicated that C.G.'s arm fractures were the result of a direct blow and a twisting motion and were inconsistent with the explanation Gutierrez had given them.  Doctors also testified that they believed C.G.'s injury was due to abuse given the nature of the injury and C.G.'s very young age.  This evidence considered cumulatively was sufficient for a jury to conclude that Gutierrez caused C.G.'s arm fractures.

Additionally, there is no merit to Gutierrez's claim that the government failed to show territorial jurisdiction.  Although territorial jurisdiction is an essential element of the offense, the government must establish the location of a criminal activity only by a preponderance of the evidence.  See United States v. Bowers, 660 F.2d 527, 531 (5th Cir. 1981) (concluding that the government established subject matter jurisdiction by proving by a preponderance of the evidence that the defendant abused her child on a military base).[3]  The parties

_____

[3]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior

stipulated that Fort Gordon was subject to the territorial jurisdiction of the United States.[4]  Based on the evidence presented, a reasonable jury could also find by a preponderance of the evidence that the assault occurred in Gutierrez's home on Fort Gordon military base.  Therefore, the district court had subject matter jurisdiction and properly denied Gutierrez's motion for a judgment of acquittal and motion to arrest the judgment.

## B.    Statement to Sergeant Kahn

Gutierrez argues that the district court erred when it refused to hold a Jackson v. Denno hearing before admitting his written statement taken by Sergeant Kahn.[5]

Under Jackson v. Denno, "[a] defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined."

_____

to October 1, 1981.

[4]In his argument, Gutierrez uses interchangeably the terms subject matter jurisdiction and venue.  To the extent Gutierrez argues that the Southern District of Georgia, Augusta Division, was an improper venue for him to be tried, he has waived that argument by failing to raise it in the district court.  See United States v. Greer, 440 F.3d 1267, 1271 (11th Cir. 2006).

[5]The government argues that Gutierrez's statement was not a confession for purposes of Jackson v. Denno because it was not inculpatory.  See 18 U.S.C. § 3501(e) (codifying Jackson v. Denno and defining a confession as "any confession of guilt of any criminal offense or any self-incriminating statement made or orally given or in writing").  Because we conclude that Gutierrez failed to allege facts warranting a hearing in any event, we need not resolve whether Gutierrez's statement was a confession.

11

Jackson v. Denno, 378 U.S. 368, 380, 84 S. Ct. 1774, 1783 (1964). Such a hearing, to be conducted outside the presence of the jury, "is constitutionally mandated for a defendant who timely urges that his confession is inadmissible because not voluntarily given." United States v. Davidson, 768 F.2d 1266, 1270 (11th Cir. 1985). However, we will not remedy a district court's failure to hold a Jackson v. Denno hearing unless the defendant "allege[s] facts which would, if proven true, indicate the involuntariness of his confession." Id.

Here, Gutierrez failed to allege facts indicating that his statement given to Sergeant Kahn was involuntary. After the return of the superseding indictment, Gutierrez filed a motion to suppress stating that, "[s]ince discovery and defense investigation are still incomplete, the Defendant files this Motion in general form to preserve h[is] right to challenge the legality of any search or seizure of evidence that the Government might introduce against hi[m] at trial as well as any statements." The district court later directed Gutierrez to particularize his suppression motion within ten days or a hearing would not be scheduled on his suppression motion. Gutierrez did not file a more particularized motion.

At trial, Gutierrez objected to the admission of the statement during the government's direct examination of Sergeant Kahn. Specifically, Gutierrez's counsel stated that "if they are going to attempt to introduce this statement I will

12

ask that we have a <u>Jackson v. Denno</u> hearing before it is introduced before the jury." Gutierrez's counsel did not articulate the basis for suppression or identify any facts suggesting that Gutierrez's statement was involuntary. After the district court denied Gutierrez's impromptu request for a <u>Jackson v. Denno</u> hearing, Gutierrez renewed his objection, but did not argue that the statement was involuntary.

In addition, none of the evidence presented at trial indicates that Gutierrez's statement was involuntary. Sergeant Kahn met with Gutierrez at the hospital and directed him to meet her at the military police statement to give a statement. Gutierrez drove himself to the military police station, completed his statement within a half hour, and was irritated but cooperative. The interview took place in an office within the military police station with only Sergeant Kahn present. An MP patrolled the halls outside as a security measure. Sergeant Kahn advised Gutierrez of his <u>Miranda</u> rights, including his right to remain silent. Gutierrez then executed a <u>Miranda</u> waiver, which also advised him that he could remain silent.

Sergeant Kahn reviewed Gutierrez's version of events with him a couple of times and then asked Gutierrez to write it down on the narrative portion of the statement form. Gutierrez did so. Sergeant Kahn then completed the question and answer portion of the statement form. Gutierrez was permitted to verify the

13

questions and answers and initialed each to show that he agreed with the answers Sergeant Kahn had written. The affidavit portion of the statement, which Gutierrez signed, avers that Gutierrez was not threatened or forced to give a statement.

On appeal, the only fact Gutierrez points to in support of his claim that he was entitled to a Jackson v. Denno hearing is that Sergeant Kahn admitted on cross examination that during the interview Gutierrez was not free to leave the military police station. The mere fact that Gutierrez was in police custody when he gave his statement does not, alone, establish coercion. See United States v. Thompson, 422 F.3d 1285, 1296 (11th Cir. 2005) (explaining that a finding of involuntariness under the Fifth Amendment's Due Process Clause requires as a prerequisite coercive government conduct such as "subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces the confession" (quotation marks omitted)). On this record, we cannot say the district court erred in denying Gutierrez's request for a Jackson v. Denno hearing.[6]

## C.    Motion for a Mistrial

---

[6]It is unclear whether Gutierrez is contending that he also was entitled to a hearing on a claim that his statement was being offered in violation of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966). See United States v. Arbolaez, 450 F.3d 1283, 1292 (11th Cir. 2006). However, Gutierrez did not ask for a Miranda hearing in the district court, and the record here shows Gutierrez knowingly and voluntarily waived his Miranda rights.

14

Gutierrez contends that testimony elicited by the government about his decision to terminate his interview with Agent Wilhelm impermissibly commented on Gutierrez's decision to invoke his right to remain silent. According to Gutierrez, the district court should have granted his motion for a mistrial after this testimony was given.

During trial, Agent Wilhelm was cross-examined vigorously about his failure to take notes or otherwise record his interview with Gutierrez. When first asked why he had not taken notes, Agent Wilhelm responded, "Generally what we [at CID] do is we ask the suspect to type up a narrative which in this case the interview ended before we had a chance to do that." Later, when defense counsel pressed Agent Wilhelm about his failure to record important aspects of Gutierrez's interview, Agent Wilhelm responded, "As I said under the normal procedure we have a typed narrative recounting his facts of the case and in this case we didn't get to that point because he terminated the interview."

During redirect examination, the government asked Agent Wilhelm whether it was his normal procedure to obtain a written statement from a suspect he had interviewed. Gutierrez's counsel objected, and the district court stated that it would allow the question and suggested that the matter be addressed at the next opportunity without the jury present. The following exchange then occurred:

15

Q. When you are interviewing someone do they have the right to terminate that interview before giving you that written statement?
A. Yes.
Q. Is that what happened in this case?
A. Yes.

At the next break, outside the presence of the jury, Gutierrez objected to the government referring to Gutierrez's voluntarily terminating the interview and moved for a mistrial. The district court concluded that Gutierrez's cross-examination had invited the testimony, overruled the objection and denied the motion for a mistrial.

Under Doyle v. Ohio, a prosecutor's "use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." 426 U.S. 610, 619, 96 S. Ct. 2240, 2245 (1976). However, not every mention of a defendant's post-Miranda silence is a Doyle violation. See United States v. Stubbs, 944 F.2d 828, 834-35 (11th Cir. 1991). Rather, a Doyle violation occurs when "the statement was manifestly intended or was of such character that a jury would naturally and necessarily take it to be a comment on the failure of an accused to testify." United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999). "The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so." United

16

States v. Knowles, 66 F.3d 1146, 1163 (11th Cir. 1995) (quotation marks omitted).

The district court must consider the remark in context to determine the prosecutor's

motive and the impact upon the jury.  Id.[7]

Given the context in which the testimony was elicited, we conclude that

there was no Doyle violation.  Agent Wilhelm's testimony that Gutierrez

terminated the interview was elicited twice by Gutierrez's own counsel during

cross-examination without any objection.  Gutierrez's counsel effectively

impeached Agent Wilhelm by inferring that Agent Wilhelm had been negligent at

best and possibly underhanded in failing to take notes during the interview.  The

government's questions on redirect were intended to rehabilitate Agent Wilhelm by

clarifying that Agent Wilhelm had acted in accordance with CID policy during the

interview, and that the failure to memorialize the interview in writing was not the

result of either negligence or some nefarious plan, but because Gutierrez ended the

interview before that could happen.  See United States v. Rodriguez-Cardenas, 866

F.2d 390, 394 (11th Cir. 1989) (explaining that a prosecutor may use redirect

examination "to rebut false impressions that arise from cross-examination").

In sum, it does not appear from the record that the government's purpose

---

[7]We review for an abuse of discretion a district court's denial of a motion for a mistrial based on an improper comment on the defendant's right to remain silent.  Knowles, 66 F.3d at 1163.  We have held that "[a] defendant is entitled to a grant of mistrial only upon a showing of substantial prejudice."  Chastain, 198 F.3d at 1352.

17

was to comment upon Gutierrez's decision to invoke his right to remain silent.

Nor can we say that the government's questions and Agent Wilhelm's answers on redirect were "of such a character" that the jury necessarily would have taken them to be a comment on Gutierrez's decision to invoke his right to remain silent. Therefore, the district court properly denied Gutierrez's motion for a mistrial.

## D.    Jury Instruction

Finally, Gutierrez contends that the district court erred in giving a supplemental jury instruction on the meaning of the term "intentional assault."[8]

During the initial jury charge, the district court instructed the jury on the elements of an assault under 18 U.S.C. § 113(a)(6).  Specifically, the district court explained, among other things, that the government was required to prove these three elements of an assault under 18 U.S.C. § 133(a)(6): (1) that Gutierrez intentionally assaulted C.G.; (2) that Gutierrez intentionally assaulted C.G. within the territorial jurisdiction of the United States; and (3) that, as a result of the assault, C.G. suffered a serious bodily injury.  After retiring to deliberate, the jury sent a note to the district court stating, "Need judge to define 'intentional assault'

---

[8]This Court reviews for abuse of discretion a district court's supplemental charge in response to a jury question.  United States v. Delgado, 56 F.3d 1357, 1363 (11th Cir. 1995).  We review the challenged jury instruction in the context "of the entire jury charge, in light of the indictment, evidence presented and argument of counsel to determine whether the jury was misled and whether the jury understood the issue." United States v. Johnson, 139 F.3d 1359, 1366 (11th Cir. 1998) (quotation marks omitted).

18

page twelve of instructions." The parties agreed that the jury was probably confused by the fact that a § 113(a) assault encompasses the common law concepts of both assault and battery and agreed that the district court should clarify this point.

The jury was brought into the courtroom. The district court first reminded the jury of its earlier charge and advised the jury not to consider any part of the instructions as more important than other parts. The district court then reread the instructions regarding a § 113(a)(6) offense and the definition of the words "knowingly" and "wilfully." The district court next explained the common law concepts of assault and battery, as follows:

> What does assault mean? . . .
>
> Under the English common law there were the two related concepts that I am sure you have heard many, many times and perhaps you've wondered what exactly it was and I am going to explain it to you. What I'm talking about is assault and batter[y] and very commonly these terms are used together, in conjunction with each other and almost meaning the same thing.
>
> An assault, generally, is to put someone in fear of being harmed. You can do that lunging at someone, charging at someone, pointing a gun at someone or something like that. I use those only as examples of the concept.
>
> Now, a battery is the extension or the culmination of an assault. A battery is the actual unlawful touching of someone. It can be something as minor [as] a simple touching. It can be a touching in an inappropriate place. Or a battery might be a touching or a blow sufficient to produce a serious bodily injury. So, you can say that a battery always includes an assault, but that an assault is or may be the preamble of a battery.

19

The district court also explained how these common law concepts applied in a

§ 133(a) offense, as follows:

> Now, I don't want to try to dissect the federal law or tell you exactly what the purposes of the Congress were, but I will tell you that this concept of assault in federal law goes back a long way and it is my belief, – I can't tell you this is the law, but it is my belief – that the people that wrote the federal statute were trying to simplify it and trying to say basically we are distinguishing between assault and battery. We are carrying that common law distinction into the federal juris prudence [sic]. We are going to use just one word and we are going to use assault. If you think the attempt toward simplification has created confusion that is your business.
>
> My point right now is that in the federal law assault and battery are the same thing. A battery being a completed assault, if you would.
>
> An individual may commit an assault either by an intentional and voluntary act which does injury to another person or an intentional voluntary act which is a threat to do it. So, the definition of assault is broader in the law in the federal sector than is involved in this case.

The district court then explained that the government's case involved an alleged

completed assault that produced an actual injury, rather than just a threat of injury:

> Quite clearly under the evidence, under the argument and under the theory of [the] Government's case the prosecution is alleging in the indictment and has argued not that the Defendant Gutierrez put baby [C.G.] in fear of an injury[.] [T]o the contrary the theory of the Government's case is that conduct of the defendant actually produced an injury to the child. So, here in this case the theory of the Government, the allegations and the argument, is that the child was actually injured as a result of this alleged assault.
>
> While one might commit an assault under federal law by threatening an injury if the individual has at the same time the apparent present ability to produce an injury that's not what we are talking about here. Quite clearly and simply the Government argues

20

and its theory of the case is that the conduct of the Defendant Gutierrez actually produced an injury.

Finally, the district repeated the instruction relating to the three elements of a § 113(a)(6) offense. After a sidebar, the district court reminded the jury not to single out any of his instructions as having special significance and reiterated that the term "intentional" meant a purposeful act and did not require the government to prove that the defendant intended all the consequences resulting from the act:

> Members of the jury, I'm not going to tell you again that you should not single out any one of my instructions alone as having any special significance or any one of my instructions alone as stating the law, but I will tell you with respect to this concept of intentional, which is one of the words you focused on in your question, it is not necessary that the Government prove that the defendant intended all of the consequences that might flow from an act. It is only necessary that the Government prove beyond a reasonable doubt that the defendant did the act or the thing which the law forbids on purpose. That it was done intentionally and not as a result of a mistake or accident.

After the jury left the courtroom, Gutierrez objected "to that portion of the charge that dealt with the proof offered by the Government" and "to the last part of the charge dealing with the intent to cause harm to the victim."

On appeal, Gutierrez argues that the district court erred in giving the supplemental instruction by: (1) misstating the law of "assault"; and (2) interjecting the judge's opinions about the Government's theory of the case. With regard to the first argument, we conclude that the district court did not misstate the

21

law on the meaning of "intentional assault."  Although § 113 does not define "assault," this Court has given the term its common law meaning and has concluded that assault can be "a battery, an attempted battery, or an act that puts another in reasonable apprehension of receiving immediate bodily harm." Williams, 197 F.3d at 1096.  Furthermore, a § 113 assault by battery includes the "least touching of another's person wilfully" and does not require an intent to do bodily harm.  Id.

We also do not agree that the district court's comments "had the effect of inferring to the jury that the Government had established its burden of proof in the case."  The district court's supplemental instruction explained the multiple concepts encompassed within the term "assault" under § 113.  The district court's clarification as to the government's theory of the case merely advised the jury that it need not consider the other definitions of assault because the government had proceeded only on the theory that an assault by battery had been committed.

**AFFIRMED.**