[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 13-11812; 13-11831
_____

D.C. Docket No. 1:12-cr-20106-RSR-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

SHADRACH THOMPSON,
MESHACH THOMPSON,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 11, 2014)

Before HULL, COX and FARRIS,[*] Circuit Judges.

PER CURIAM

_____

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Identical twin brothers Shadrach Thompson and Meshach Thompson appeal their convictions and sentences after a jury found them guilty of conspiring to possess and possessing oxycodone with intent to distribute, in violation 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846, and 18 U.S.C. § 2. After careful review of the briefs and the record, and with the benefit of oral argument, we affirm.

## I. BACKGROUND

The basic facts are these. The FBI arrested a man named Rechard Bartley (also known as "Big" or "Shard") for selling oxycodone pills to a government informant. Bartley then agreed to help with the prosecution of one of his associates, Omar Wadley (also known as "Avo"). Bartley introduced Wadley to an undercover agent posing as a distributor of oxycodone pills.

Wadley indicated to the undercover agent that he was interested in purchasing a large quantity of oxycodone pills on behalf of some buyers from New York who would travel to South Florida. Wadley described these buyers as his "blood" or his "cousins" and indicated that he grew up with them. Defendant Shadrach Thompson's ex-girlfriend, Tahii Huey, testified that Shadrach asked her to rent a car so that Shadrach and Meshach could travel from New York to Florida to visit their cousin, Wadley.

The government's case also included text messages between Wadley and the Thompson twins. These messages discuss the defendants' trip from New York to

2

Florida, the specific amount of pills to be purchased from the undercover agent, and elaborate negotiations of the purchase price.[1]

On June 30, 2010, Wadley asked the undercover agent to come to a condominium at the Intracoastal Yacht Club in Sunny Isles Beach, Florida. Instead of going into the condominium, the undercover agent asked Wadley to come outside and complete the transaction in the agent's vehicle. After the undercover agent showed Wadley the oxycodone pills in the car, Wadley went back to the condominium to get the purchase money. When Wadley returned to the car, the undercover agent handed him the pills. Wadley, in turn, placed the purchase money on the center console and told the undercover agent that the amount was $16,000. Law enforcement officers then arrested Wadley and seized his cell phone.

At the same time, uniformed law enforcement officers went into the lobby of the Intracoastal Yacht Club. They saw Shadrach Thompson and Meshach Thompson exiting the elevator to the lobby. When the twins noticed the officers, they ran away—one back into the elevator, the other towards the garage. Both were apprehended and detained for a period. Law enforcement officers took a picture of each defendant during this detention—but ultimately released them.

---

[1]This evidence is set forth in greater detail below.

Law enforcement officers also spotted a vehicle from New York in the yacht club's parking garage. They determined that this vehicle was the one rented in New York by Tahii Huey, Shadrach Thompson's ex-girlfriend.

After the jury found both Shadrach Thompson and Meshach Thompson guilty of conspiring to possess oxycodone with intent to distribute (Count One) and possessing oxycodone with intent to distribute (Count Two), the district court sentenced each defendant to 98 months of imprisonment on both counts, to be served concurrently.

## II. MESHACH THOMPSON

Meshach Thompson raises three issues on appeal. We address each of them in turn.

### A.    Admission of the Contents of Wadley's Cell Phone

As part of its case in chief, the government presented the contents of the cell phone seized from Wadley. Meshach Thompson contends that this evidence was impermissible hearsay. He further argues that its admission violated the Confrontation Clause of the Sixth Amendment because Wadley did not testify at trial, even though he was available to do so.

We begin with a review of the evidence in question. After seizing Wadley's phone pursuant to a search warrant, Detective Howell downloaded its content onto a CD. From there, Howell printed a list of Wadley's contacts and a chronological

4

log of all text messages received by and sent from Wadley's phone. Howell then presented these materials as exhibits during his direct testimony at the defendants' trial.

Later in the trial, FBI agent MacRae testified about the list of contacts taken from Wadley's phone. The contacts included the names "Shadrach" and "Meesh." Agent MacRae explained that phone records subpoenaed from the cellphone provider, Sprint, indicated that the number listed for the "Shadrach" contact in Wadley's phone was registered on four different occasions to a person listed at the same address. However, three different names were used for the subscription of this phone number: Shaord Thomas, Shaord Thompson, and Shadrach Thompson.

The government also presented pictures of the text messages on Wadley's phone, including messages from persons identified on the phone as "$had" and "Mee$h." The latter name was accompanied by a picture of one of the Thompson twins wearing a hat. Wadley's phone also contained two videos, both date-stamped June 30, 2010, featuring Wadley and the Thompson twins. Both videos show one of the Thompson twins wearing the same hat depicted on the picture associated with the name "Mee$h" on Wadley's phone.

The text messages between Wadley, "Mee$h," and "$had" began on June 18, 2010, which was also the day the undercover agent contacted Wadley to discuss the sale of oxycodone pills. "Mee$h" texted Wadley and asked, "Your boy

5

still on deck?," to which Wadley replied, "Yeah."    Mee$h then advised Wadley: "Yea when we come we'll buy small portions day by day just to be safe but tell him to have the order on didek."   After Wadley asked when Mee$h and $had were coming, Mee$h indicated that he did not know but that he would contact Wadley when they left.

Three days later, Mee$h informed Wadley that "ni**as is not paying us no more because the price too high my boy in statin give it to us for 950."   Wadley responded: "Prolly if u get 5 or better u could get it for 8 I would have to ask him. So just try and come high.  Either way u can't lose."  Mee$h replied, "8 good for what we doing" and added, "We coming big for the 8 a pop."   Mee$h further told Wadley: "You gotta work with us and you'll eat good."   Wadley noted: "I did my part."

The next day, on June 22, 2010, $had texted Wadley that he was "[t]rying to make it down" and was "waiting for the rental."   $had asked if Wadley's "boy" was "strait," to which Wadley responded in the affirmative.  $had then asked, "8 a pop right?"   Wadley replied, "No," and asked, "How much u gettin."   $had explained: "We getting like 4000," but cautioned that "[i]t gotta be for 8 if not it won't make no sense I'm already getting it for 8 now."   Wadley advised that $had would have to "get more than that for the number to change."   $had replied: "Aight do ur thing."

6

Almost immediately after this exchange with $had, Wadley texted the undercover agent and asked how many pills he had to purchase for the price to drop. The agent replied "4 at 650." Wadley then texted $had that he "could do it for 850 but u gta get 4."

On June 27, 2010, $had told Wadley: "We on our way." When the Thompson twins arrived in Florida, Mee$h sent Wadley a message stating, "Soon link you tomorrow early get it on deck $8 a pop." On June 29, 2010, $had directed Wadley to "[m]ake sure everything is on point no surprises," and to "[c]all the link and feel him out. [M]ake sure he comes by himself." Later, $had advised Wadley that he wanted to buy 4,500 pills at $8.00 per pill. Wadley asked if he was sure and warned: "Don't let me order and u back out last min." $had replied, "Yeah all cash but it got 2 b 4 8." $had added that "a lot of bread on da [l]ine," and, "Make sure u feel homeboy out it has 2 b smooth sailin."

In finalizing the deal with the undercover agent, Wadley explored different options, including splitting the deal into two separate transactions with two different prices. $had seemed none too pleased, stating "Damn it's makin everything complicated tell him 2 make everything 8 we got everything on deck the first halph for 8 and the second for 8 don't make shit hard it would b ez 4 everybody."

7

At trial, Meshach Thompson objected to the introduction of these text messages as impermissible hearsay. The district court correctly overruled this objection. To the extent these text messages were offered for the truth of the matter asserted, they fall under the co-conspirator exception to the hearsay rule. See Fed. R. Evid. 801(d)(2)(E).

To establish this exception, "the government must prove by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included the declarant and the defendant against whom the statement is offered, and (3) the statement was made during the course of and in furtherance of the conspiracy." United States v. Underwood, 446 F.3d 1340, 1345-46 (11th Cir. 2006). A fact finder could well conclude that (1) Meshach Thompson sent the text messages from the name "Mee$h," and (2) Shadrach Thompson sent the messages from the name "$had." These text messages—along with other evidence presented at trial—readily establish that Meshach Thompson engaged in a conspiracy with Shadrach Thompson and Omar Wadley to possess oxycodone with intent to distribute. The text messages were attempts to set up and negotiate the purchase of oxycodone. As such, they were statements "made during the course of and in furtherance of the conspiracy," id. at 1346, and thus were admissible under Rule 801(d)(2)(E).

8

Meshach Thompson also argues that the admission of the materials taken from Wadley's phone violated the Confrontation Clause of the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI. In Crawford v. Washington, the Supreme Court held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  541 U.S. 36, 53-54, 124 S. Ct. 1354, 1365 (2004).  Because Wadley was available to testify but did not appear at trial, Meshach contends that the government's presentation of Wadley's text messages violated the Confrontation Clause.

This argument, however, overlooks that Wadley's text messages were not testimonial, and, thus, their admission did not implicate the Confrontation Clause. Davis v. Washington, 547 U.S. 813, 821, 126 S. Ct. 2266, 2273 (2006) (explaining that only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause").  "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."  Id.; Crawford, 541 U.S. at 51, 124 S. Ct. at 1364; see United States v. Caraballo, 595 F.3d 1214, 1227 (11th Cir. 2010); see also Michigan v. Bryant, 562 U.S. __,

9

___,131 S. Ct. 1143, 1153 (2011) (explaining that Crawford "limited the Confrontation Clause's reach to testimonial statements"); Whorton v. Bockting, 549 U.S. 406, 413-14, 127 S. Ct. 1173, 1179 (2007) (noting that non-testimonial hearsay is not governed by the Confrontation Clause).[2]

Testimonial statements include (1) "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial

---

[2]Before the Supreme Court decided Davis v. Washington in 2006, this Court held in United States v. Baker that the "[a]dmission of non-testimonial hearsay against criminal defendants . . . still violates the Confrontation Clause unless the statement falls within a firmly rooted hearsay exception, or otherwise carries a particularized guarantee of trustworthiness." 432 F.3d 1189, 1204 (11th Cir. 2005).  However, this aspect of Baker is undermined to the point of abrogation by the Supreme Court's subsequent holding in Davis that the Confrontation Clause does not apply to non-testimonial hearsay.  See 547 U.S. at 821, 126 S. Ct. at 2273.  Virtually all of our sister circuits have recognized Davis's rule.  See Desai v. Booker, 732 F.3d 628, 630 (6th Cir. 2013) (indicating that the Confrontation Clause no longer applies to non-testimonial hearsay); United States v. Berrios, 676 F.3d 118, 126 (3d Cir. 2012) (explaining that "the Confrontation Clause protects the defendant only against the introduction of testimonial hearsay statements, and that admissibility of nontestimonial hearsay is governed solely by the rules of evidence"); United States v. Castro-Davis, 612 F.3d 53, 64 n.14 (1st Cir. 2010) ("After Davis, however, non-testimonial hearsay no longer implicates the Confrontation Clause at all."); United States  v. Sine, 493 F.3d 1021, 1035 n.11 (9th Cir. 2007) ("Only testimonial out-of-court statements raise Confrontation Clause concerns."); United States v. Jordan, 509 F.3d 191, 201 n.5 (4th Cir. 2007) (stating that "the Confrontation Clause has no application to out-of-court non-testimonial statements" (quotation marks omitted and alterations adopted)); United States v. Ellis, 460 F.3d 920, 923 (7th Cir. 2006) ("Hearsay evidence that is nontestimonial is not subject to the Confrontation Clause." (quotation marks omitted)); accord. United States v. Clark, 717 F.3d 790, 814-17 (10th Cir. 2013); United States v. Shyne, 617 F.3d 103, 108 (2d Cir. 2010); United States v. Honken, 541 F.3d 1146, 1161 (8th Cir. 2008).

Even if we applied Baker's rule here, the result would be the same.  As set forth below, Wadley's text messages were non-testimonial co-conspirator statements—thus, their admission satisfied Baker's obsolete rule that non-testimonial hearsay statements must fall within a firmly rooted hearsay exception to pass Confrontation Clause muster.  See 432 F.3d at 1204.

10

statements that declarants would reasonably expect to be used prosecutorially," (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," and (4) statements taken by police officers during the course of an interrogation. Crawford, 541 U.S. at 51-52, 124 S. Ct. at 1364 (quotation marks omitted).

Wadley's text messages do not fall under any of these categories: They were not made in affidavits, depositions, prior testimony, or during a police interrogation. Nor were they made under circumstances that would lead Wadley to believe that the statements would be used at a later trial; indeed, Wadley would have never sent these incriminating messages had he anticipated their future use in a court of law. See Underwood, 446 F.3d at 1347.

In that same vein, the Supreme Court has stated that "statements in furtherance of a conspiracy" are "by their nature [] not testimonial." Crawford, 541 U.S. at 55, 124 S. Ct. at 1367. As noted above, Wadley's text messages were made in furtherance of a conspiracy within the meaning of Rule 801(d)(2)(E). As such, they were not testimonial. See Underwood, 446 F.3d at 1347-48 (holding that co-conspirator statements that are subject to Rule 801(d)(2)(E) are not testimonial).

11

Put another way, Wadley was not acting in the role of a "witness" for purposes of the Sixth Amendment when he sent the text messages; he was not bearing testimony of past events to be used in a criminal prosecution. See Davis, 547 U.S. at 826-27, 126 S. Ct. at 2276 (distinguishing non-testimonial statements made by a declarant describing current events in a 911 call from a declarant's testimonial statements about past events during an interrogation). Instead, Wadley's text messages were statements made as part of a conspiratorial effort to set up a future drug deal.[3]

For these reasons, we conclude that the district court did not err in admitting the evidence obtained from Wadley's cellphone.

## B.    Admission of Meshach Thompson's Photograph

Meshach Thompson contends that the district court abused its discretion in admitting into evidence a photograph of Meshach taken by law enforcement during his brief detention after the drug deal at the Intracoastal Yacht Club. This argument has no merit.

---

[3]As an aside, we also note that Meshach Thompson could have called Wadley as a witness in his own case had he wanted to question Wadley about the text messages. Meshach chose not to do so. See Jones v. Dugger, 928 F.2d 1020, 1025-26 (11th Cir. 1991) (finding no Confrontation Clause violation where the trial judge limited the defendant's cross examination of a government witness but gave the defendant the option to call this same witness in his own case); see also United States v. Reyes, 542 F.3d 588, 594-95 (7th Cir. 2008) (same).

12

Before the first trial of this case,[4] the district court found that the brief detention of Meshach was a valid Terry stop and, therefore, the admission of the picture taken during the stop did not violate the Fourth Amendment. Meshach renewed his objection to the admission of the photograph during the second trial, but the district court adopted its prior ruling. On appeal, Meshach does not challenge the legal grounds underlying this Terry stop decision.[5]

Instead, Meshach Thompson argues that the use of the picture violated a stipulation the government made in response to Meshach's motion in limine before the magistrate judge. The district court considered this argument, concluding that Meshach's motion sought to exclude from evidence only the following items obtained during Meshach's brief detention: (1) Meshach's two cell phones, (2) cash, and (3) a set of keys. The government's stipulation agreed only to the exclusion of these three items. The photograph taken of Meshach during his detention was not included in the government's stipulation.

Our review of the record suggests that the district court did not err in so ruling. The government indeed stipulated only that it would not introduce

---

[4]The first trial in this case ended in a mistrial.

[5]In his initial brief, Meshach argues only that the photo had been suppressed already under Terry and that the photo's admission violated the stipulation. We note, however, that Meshach challenges the district court's Terry-stop ruling in his reply brief. However, "arguments raised for the first time in a reply brief are not properly before a reviewing court." Herring v. Sec'y, Dep't of Corrs., 397 F.3d 1338, 1342 (11th Cir. 2005). Meshach also has not shown that the district court's Terry-stop ruling lacked support.

13

evidence related to Meshach's two cell phones, the cash, and the keys.  And, the magistrate judge's order denying Meshach's motion as moot expressly ruled that the scope of the government's stipulation was limited to evidence related to the cell phones, the cash, and the keys.  As such, the district court did not err in concluding that the introduction of the photograph did not violate the government's stipulation.

## C.     Identification of Meshach Thompson

Meshach's last argument is that there was insufficient evidence to identify him as a participant in the drug conspiracy.  This argument, however, seems to depend on the success of Meshach's first two arguments:  take away the contents of Wadley's cell phone and take away the picture identifying Meshach as one of the people detained at the yacht club, the jury would have had no basis to identify Meshach as a co-conspirator.

But, given that the district court did not err in admitting this evidence, there is little left of Meshach's final argument.  The jury heard evidence that Meshach was at the yacht club at the time of the June 30, 2010 drug deal and that he scurried away after seeing law enforcement in the lobby.  The jury also heard Huey's testimony that she rented the car for Shadrach and Meshach to travel from New York to Florida where they would visit their cousin Wadley—the man who told the undercover agent that he was purchasing the oxycodone pills for his cousins.

14

The jury also heard the extensive evidence taken from Wadley's phone, including evidence from which the jury could have found that: (1) Meshach was a contact in Wadley's phone; (2) Meshach was the one who wrote the messages sent from "Mee$h" to Wadley's phone; and (3) these text messages between Meshach, Shadrach, and Wadley establish beyond a reasonable doubt that Meshach was a participant in a conspiracy to buy oxycodone with intent to distribute it later. As such, there was sufficient evidence for the jury to identify Meshach Thompson and find him guilty.[6]

For these reasons, we reject the three arguments raised by Meshach Thompson and affirm his conviction.

## III. SHADRACH THOMPSON

Shadrach Thompson raises two issues pertinent to his conviction.

## A.    Information Obtained from Rechard Bartley

To recall, the government's prosecution of the Thompson defendants began with the arrest of Rechard Bartley for selling oxycodone to a government informant. Bartley then agreed to cooperate in the prosecution of Omar Wadley, a

---

[6]In his reply brief, Shadrach Thompson also raises a sufficiency challenge based on the lack of identification evidence. Shadrach says he can do so for the first time in his reply brief because his initial brief adopted Meshach's arguments. In any event, we reject Shadrach's "identification" argument for the same reason we reject Meshach's argument.

We also point out that on appeal the defendants challenge the sufficiency of the evidence only with respect to the jury's ability to identify them as the persons involved in the oxycodone drug deal. They do not challenge the sufficiency of the evidence as to other elements of their two drug convictions.

15

drug broker and associate of Bartley. It was the investigation and eventual arrest of Wadley that led law enforcement to identify the Thompson defendants as Wadley's customers and co-conspirators in the purchase of over 4,500 oxycodone pills.

Rechard Bartley was available to testify at the Thompsons's trial—but he did not. Shadrach Thompson contends that the government instead presented Agent MacRae to testify about what he learned from Bartley. According to Shadrach, this violated his Sixth Amendment right to confront Bartley as a witness against him.

Given that we have already outlined the Confrontation Clause principles earlier in this opinion, we turn directly to the specific testimony at issue. First, the government asked Agent MacRae when he learned certain information about Wadley, who is also known as Avo:

> **Government**: What information did you have about Mr. Avo at this point?
>
> **Agent MacRae:** At this point I knew the general vicinity, where Avo lived and I knew that Avo and Mr. Bartley had a previous relationship.

Later in the trial, Agent MacRae also testified that Bartley told him "[t]hat there were other individuals . . . with Mr. Wadley who are involved in oxycodone transactions."

16

Although Agent MacRae learned this information from Bartley, we agree with the government that its admission did not violate the Confrontation Clause. Only testimonial out-of-court statements offered for the truth of the matter asserted implicate the Confrontation Clause. United States v. Jiminez, 564 F.3d 1280, 1286-87 (11th Cir. 2009) ("There can be no doubt that the Confrontation Clause prohibits only statements that constitute impermissible hearsay."); Crawford, 541 U.S. at 59 n.9, 124 S. Ct. at 1369 (explaining that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted").

Agent MacRae's testimony that he knew that Avo (Wadley) had a previous relationship with Bartley or that there were other people involved in oxycodone transactions with Wadley was not offered for the truth of the matters asserted. Instead, it was offered for the non-hearsay purpose of explaining the course of the government's investigation—for example, how the government learned about Wadley/Avo, why its investigation focused on him, and why the government pursued other individuals who may have been associated with Wadley.

"Statements by out of court witnesses to law enforcement officials may be admitted as non-hearsay if they are relevant to explain the course of the officials' subsequent investigative actions, and the probative value of the evidence's non-hearsay purpose is not substantially outweighed by the danger of unfair prejudice

17

caused by the impermissible hearsay use of the statement." United States v. Baker, 432 F.3d 1189, 1208 n.17 (11th Cir. 2005); see also United States v. Hawkins, 905 F.2d 1489, 1495-96 (11th Cir. 1990) (explaining that a statement by an out-of-court witness to a government agent "was properly admissible to explain why the investigation was launched, and to rebut the defense's claims" that there was no basis for the investigation). We conclude that the non-hearsay purpose of these particular statements was not substantially outweighed by the danger of any unfair prejudice that could result from any impermissible hearsay use. Therefore, the admission of these two statements was not error.

Shadrach Thompson also points to Agent MacRae's testimony about Bartley's other associates and about Bartley's nickname. We begin with the exchange about Bartley's associates:

> **Government:** I also want to ask you something about your arrest and investigation into the individual we're talking about Mr. Rechard Bartley.
>
> Did you know any of his other associates by name?
>
> **Agent MacRae**: Yes, I did.
>
> **Government**: Were any of those associates that you knew at the time named $had?
>
> **Agent MacRae**: No, sir.

A little later, the government asked Agent MacRae about Bartley's nickname:

18

**Government**: Now Mr. Bartley do you know if he went by any nicknames?

**Agent MacRae**: Yes.

**Government**: How do you know what nicknames he went by?

**Agent MacRae**: Throughout the investigation I learned of the names he went by.

[. . . ]

**Agent MacRae**: The nicknames he went by were Shard and Big.

Shadrach contends that the government used this testimony as substantive evidence that "$had" was not Rechard "Shard" Bartley nor one of his associates. In other words, this testimony was part of the government's case that Shadrach Thompson—as opposed to Rechard "Shard" Bartley or anyone else—was the one who sent the incriminating text messages to Wadley's phone under the name "$had." And, indeed, the government's brief seems to concede that the purpose of this testimony was to avoid confusion between "$had" and "Shard."

Be that as it may, we fail to see how this evidence created reversible error—even assuming that its admission violated the Confrontation Clause as a testimonial out-of-court statement offered for the truth of the matter asserted. This Court "will not reverse a conviction based on an evidentiary error 'unless there is a reasonable likelihood that the errors affected the defendant's substantial rights.'" United States v. Caraballo, 595 F.3d 1214, 1229 n.1 (11th Cir. 2010) (quoting United

19

States v. Emmanuel, 565 F.3d 1324, 1332 (11th Cir. 2009)) (alterations adopted). "For violations of the Confrontation Clause, harmless error occurs where it is 'clear beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. (quoting United States v. Candelario, 240 F.3d 1300, 1307 (11th Cir. 2001)).

If anything, the government did Shadrach Thompson a favor by introducing this evidence:  in so doing, the government injected the possibility that Shard—as opposed to Shadrach Thompson—could be behind the name "$had."  Without this testimony, the jury would have never heard of the existence of a "Shard."  In other words, the government's introduction of this evidence allowed Shadrach to argue that "$had" could have been Rechard "Shard" Bartley.

The same is true about the law enforcement agent's testimony that Bartley, a known drug dealer, did not have an associate named "$had."  From this, the jury may well have concluded that Shadrach Thompson did not travel in Bartley's ring of oxycodone dealers—a favorable inference for Shadrach as a defendant in this case.

To the extent Shadrach Thompson suggests that the jury's verdict would have been different had this evidence been excluded, we disagree.  The jury had ample of evidence to conclude that Shadrach Thompson was the one who sent the text messages under the name "$had."  The jury also heard plenty of evidence to

conclude that the defendant Shadrach Thompson was involved in this oxycodone drug dealing. This would have been so even without the Agent MacRae's two brief statements that Bartley's nickname was "Shard" and that Bartley did not have an associate named "$had."

For these reasons, we find no reversible error in the admission of information that Agent MacRae obtained from Rechard Bartley during his investigation.

## B.    Shadrach Thompson's Silence

Shadrach contends that the government impermissibly commented on his silence, thereby violating his Fifth Amendment right to remain silent. This argument is devoid of merit.

"The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify." United States v. Muscatell, 42 F.3d 627, 631 (11th Cir. 1995). "A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Knowles, 66 F.3d 1146, 1162-63 (11th Cir. 1995) (quotation marks and footnote omitted). "The defendant bears

21

the burden of establishing the existence of one of the two criteria." Id. at 1163

(quotation marks and footnote omitted).

Shadrach Thompson does not even come close to establishing that the

government made any statement (1) intended to be a comment on Shadrach's

silence or (2) of such a character that a jury would naturally and necessarily take it

to be a comment on Shadrach's silence.  Instead, Shadrach points only to the

following:

First, the government asked a law enforcement officer whether Shadrach

told the officer why he ran away when he saw the officer in the lobby of the

Intracoastal Yacht Club.  But the district court did not allow the law enforcement

officer to answer this question at trial.  The jury never heard an answer to this

question.

Second, prompted by the government's questions, Agent MacRae testified

that (1) Bartley agreed to cooperate with law enforcement, (2) it is "normal" for

people to cooperate after an arrest, but (3) there have been instances where the

agent has arrested someone for selling or purchasing oxycodone and that person

then refused to cooperate.

Neither instance constituted a prosecutor's statement intended to be a

comment on Shadrach's silence or of such a character that a jury would naturally

and necessarily take it to be a comment on Shadrach's silence.  In fact, no

22

reasonable juror could perceive either one of these two exchanges as a prosecutor's comment on Shadrach's failure to testify at trial.[7]

As such, we reject Shadrach's argument and confirm his conviction.

## IV. SENTENCING

Shadrach Thompson also challenges his sentence of 98 months' imprisonment as both procedurally and substantively unreasonable.

### A.    Presentence Investigation and Report

The Probation Office prepared a Presentence Investigation and Report ("PSR"), which set forth the offense conduct as described earlier in this opinion. In addition, the PSR contained statements from Wadley to law enforcement officers that his purchase of 4,500 oxycodone pills from the undercover agent was for Shadrach and Meshach's benefit and that they supplied all of the money to purchase the pills.

Wadley further told law enforcement that Shadrach and Meshach traveled from New York to Florida on several prior occasions and provided Wadley with money to purchase oxycodone from his sources.  Shadrach and Meshach told Wadley that they sold oxycodone pills to customers in Connecticut, Massachusetts, and Maine.  Indeed, the PSR noted that Shadrach has two pending state drug

---

[7]This Court granted Meshach's motion to adopt Shadrach's argument that the government impermissibly commented on the defendants' silence. We reject this argument as to Meshach as well.

trafficking charges in Massachusetts—one of them involving the sale of oxycodone.

The PSR also included Shadrach's statements to law enforcement officers during his detention at the Intracoastal Yacht Club. Shadrach claimed that he (1) traveled to Florida by bus to visit family, (2) only met up with Meshach the night before the June 30 transaction, and (3) had no knowledge of Wadley's purchase of oxycodone.

The PSR explained that, according to a laboratory analysis, the actual weight of oxycodone contained in the 2,250 pills involved in the transaction was 67.7 grams. Because 4,500 pills (the total number of pills that Wadley had negotiated to purchase) would have contained approximately 135.4 grams of oxycodone, Shadrach was held accountable for that amount.

The PSR reported that Shadrach was raised as one of six siblings by a single mother in low socio-economic conditions. Shadrach consumed alcohol and smoked marijuana from the time he was 14 or 15 years' old, and had been using them daily until the time of his arrest.

The PSR calculated a criminal history category of I and total offense level of 30, yielding a guideline range between 97 and 121 months of imprisonment. Counts One and Two in Shadrach's indictment each carried a statutory maximum prison term of 20 years.

**B.     Shadrach Thompson's Sentencing Memorandum**

In response to the PSR, Shadrach filed a memorandum arguing that the factors contained in 18 U.S.C. § 3553(a) warranted a downward variance.[8] Focusing on the personal history and characteristics factor, Shadrach submitted letters from family members and friends attesting that he helped them with jobs, through financial difficulties, and with general work around the neighborhood and his family's home.  Shadrach pointed out that he has a commitment to obtaining gainful employment, as evidenced by numerous legitimate jobs he held between 1999 and 2011.

Additionally, Shadrach explained that he had no criminal convictions and that his pending charges in Massachusetts resulted from conduct that occurred during a narrow period of time.  Shadrach argued that a guidelines sentence was greater than necessary to comply with the purposes of § 3553(a), given his strong work ethic and commitment to others.  He maintained that a sentence of 60 months' imprisonment or less was appropriate.

---

[8]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence; (4) the need to protect the public; (5) the need to provide the defendant with educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) the pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

**C.    Sentencing Hearing**

Shadrach objected to the PSR, but the district court overruled these objections and adopted the factual findings in the PSR.  Noting that "the applicable and recommended guidelines range is 97 to 121 months," the district court explained that it would "consider whatever evidence or information any party may wish to offer in extenuation, or in mitigation, or which is otherwise relevant to the sentence to be imposed in this case."

Accepting the district court's invitation, Shadrach, through counsel, repeated the arguments set forth in his sentencing memorandum, again focusing on his difficult upbringing, his work history, and the lack of a criminal history. Shadrach's attorney asked the district court to consider the "sentencing factors" and to impose a below-guideline sentence so that Shadrach could have "hope" of moving beyond the offenses in this case and resume a "law abiding life."

In response, the government requested a sentence at the high end of the guidelines range, explaining that Shadrach's family support and work history showed that Shadrach had the support and ability to make a living through law-abiding means, but instead chose to sell drugs.  The government pointed out that Shadrach did not just sell drugs locally but that he traveled great distances to purchase drugs as part of a larger operation.  Also, Shadrach's pending charges for

26

subsequent drug sales in Massachusetts indicated that Shadrach would commit additional offenses if released anytime soon.

Shadrach Thompson then personally addressed the district court, explaining that he cherished his family and his time above all else and that his convictions in this case took both away from him. Shadrach stated that he needed to be free to work hard and accomplish his personal and professional goals. Shadrach also apologized to his family and to the district court.

The government noted that Shadrach did not disclose all of the facts and circumstances of the offense to the probation officer. This lack of disclosure suggested that Shadrach was still trying to protect others and perhaps himself. Further, the government suggested that Shadrach's allocution displayed a lack of acceptance of responsibility or remorse.

After hearing these arguments, the district court stated the following:

> The Court has considered the statements of the parties and has reviewed the Presentence Investigation and Report. The Court presided over the trial of this case and is fully familiar with all the facts and circumstances surrounding the offense.
>
> The Court has previously adopted the factual findings in the guidelines application as contained in the Presentence Investigation and Report.
>
> The Court has found the total offense level is 30 and the criminal history category is one, that the applicable guidelines range is 97 to 121 months. The Court will impose a sentence at the low end of the guidelines range. The Court finds that the defendant is not able to pay

a fine, [n]or is he likely to be able to pay a fine. And hence, no fine will be imposed in this case.

Accordingly, and pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court and the sentence of the law that the defendant, Shadrach Thompson, be committed to the custody of the Federal Bureau of Prisons to be confined for a total term of 98 months as to Counts One and Two of this indictment. The sentences herewith imposed as to Count One and Count Two are to run concurrent with each another.

After pronouncing the sentence, the district court asked the parties if they had any objections to its findings of fact, its conclusions of law, or "the manner about which sentence was imposed." Shadrach objected to the district court's denial of his request for a downward variance, which the district court overruled.[9]

## D.    Discussion

"We review the reasonableness of a sentence for abuse of discretion using a two-step process." United States v. Tuner, 626 F.3d 566, 573 (11th Cir. 2010). "We look first at whether the district court committed any significant procedural error and then at whether the sentence is substantively reasonable under the totality of the circumstances." Id. "The party challenging the sentence bears the burden to show it is unreasonable in light of the record and the § 3553(a) factors." Id.

---

[9]We note that the sentencing judge was also the trial judge and thus had heard the trial evidence. On appeal, Shadrach Thompson does not challenge the district court's fact findings or the guidelines calculations. Rather, Shadrach challenges the district court's (1) denial of a downward variance, (2) alleged failure to adequately consider the § 3553(a) factors, and (3) allegedly insufficient reasons for the chosen sentence.

28

Here, Shadrach Thompson contends that his 98-month sentence was procedurally unreasonable because the district court did not adequately explain the sentence, making review to determine whether the sentence achieves the § 3553(a) factors impossible.  We disagree.

 "Pursuant to 18 U.S.C. § 3553(c)(1), a district court is required to state, in open court, the reason for its particular sentence, and if the sentence 'is of the kind, and within the range recommended by the Guidelines and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range. " United States v. Bonilla, 463 F.3d 1176, 1181 (11th Cir. 2006)(quoting 18 U.S.C. § 3553(c)(1))  (alterations adopted).  "While a sentencing judge is not required to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors, the sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." United States v. Livesay, 525 F.3d 1081, 1090 (11th Cir. 2008) (quotation marks and citations omitted, alterations adopted).   Put differently, "[a] sentencing court is not required to incant the specific language used in the guidelines or articulate its consideration of each individual § 3553(a) factor, so long as the record reflects the court's consideration of many of those factors."  United States v. Ghertler, 605

F.3d 1256, 1262 (11th Cir. 2010) (quotation marks omitted and alterations adopted).

The record here amply reflects that the district court considered Shadrach Thompson's sentencing memorandum seeking a downward variance based on the § 3553(a) factors. After listening to Shadrach's arguments, the district court stated that it had considered the parties' statements and all the facts contained in the PSR. Notably, Shadrach's memorandum, his arguments at the hearing, and the PSR contained arguments based on the §3553(a) factors. The district court then indicated that a sentence at the low end of the guideline range was warranted and, accordingly, imposed a sentence of 98 months, which is only one month above the minimum suggested by the applicable advisory guidelines range. Thus, the record reveals that the district court considered the § 3553(a) factors, even though it did not specifically incant the language of these factors. See United States v. Dorman, 488 F.3d 936, 944 (11th Cir. 2007) (finding the district court's sentence procedurally reasonable where the district court did not "explicitly articulate that it had considered the § 3553(a) factors," but "by virtue of the court's consideration of [the defendant's] objections and his motion for a downward departure, the court did, in fact, consider a number of the sentencing factors"). Here, we cannot say that the district court's explanation of Shadrach's sentence was procedurally unreasonable. See Livesay, 525 F.3d at 1090 ("Generally, when sentencing within

30

the advisory Guidelines range, the district court is not required to give a lengthy explanation for its sentence if the case is typical of those contemplated by the Sentencing Commission.").

Nor can we say that Shadrach's sentence was substantively unreasonable. This Court "ordinarily expect[s] a sentence within the Guidelines range to be reasonable," United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008) (quotation marks omitted and alterations adopted), and a sentence imposed well below the statutory maximum penalty is another indicator of a reasonable sentence, see United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008) (holding that the sentence was reasonable in part because it was well below the statutory maximum).

Shadrach Thompson received a sentence at the low end of the advisory guidelines range and well below the statutory maximum of 20 years.   Shadrach has not pointed to anything that would justify vacating the district court's sentence. See United States v. Pugh, 515 F.3d 1179, 191 (11th Cir. 2008) (holding that this Court will vacate a sentence as substantively unreasonable only if "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies

31

outside the range of reasonable sentences dictated by the facts of the case"

(quotation marks omitted)).[10]

## V. CONCLUSION

For the forgoing reasons, we affirm the convictions and sentences of both

defendants.

AFFIRMED.

---

[10]We note that Meshach Thompson does not challenge his sentence of 98 months' imprisonment.